

**CT Corporation**
**Service of Process Notification**
12/30/2025
CT Log Number 550982244

## Service of Process Transmittal Summary

**TO:**      Dana Sharitt
             Wayne Farms LLC
             4110 CONTINENTAL DR
             OAKWOOD, GA 30566-2800

**RE:**      **Process Served in Alabama**

**FOR:**     Wayne Farms LLC  (Domestic State: DE)

**ENCLOSED ARE COPIES OF LEGAL PROCESS RECEIVED BY THE STATUTORY AGENT OF THE ABOVE COMPANY AS FOLLOWS:**

| | |
|---|---|
| **TITLE OF ACTION:** | ALEXIS BIANCA ADAMS; CHRISTAL DENISE ANGLIN; CHRISTOPHER LEMONT ANGLIN; JAMES ELBERT ANGLIN JR; DEVAN TAMAR BAXTE; BRUCE CODERRICK BAXTER; DENISE BLACKMON; ARTHUR LEE BLAKELY, JR.; JAMES BOSWELL, JR.; BETTY JO BOYKIN; EZEKEL BOYKIN; ALFREDA M BURKS; BETTY ANN BURKS; BRUCE BURKS; ANDREW CAREY; DORIS M. CAREY; DANNY LEE CHAMBERS; ISOM RAKEEM DAFFIN; BOBBY DANIELS; CAROLYN WHIGHAM DANIELS; CORDARYLL DYSHAWN DANIELS; FREDERICK DANIELS; JACQUELINE S. DAVIS; JASMINE RAYDEN DAVIS; CHERRY ANN DEVOSE; DE vs. AGRI STATS, INC. |
| **CASE #:** | 06CV202590004800 |
| **PROCESS SERVED ON:** | C T Corporation System, Montgomery, AL |
| **DATE/METHOD OF SERVICE:** | By Traceable Mail on 12/30/2025 |
| **JURISDICTION SERVED:** | Alabama |
| **ACTION ITEMS:** | SOP Papers with Transmittal, via  UPS Next Day Air |
| | Image SOP |
| | Email Notification,  Dana Sharitt  dana.sharitt@waynesanderson.com |
| | Email Notification,  Debbie Herring  debbie.herring@waynesanderson.com |
| | Email Notification,  Judith Carswell  judith.carswell@waynesanderson.com |
| | Email Notification,  Tracy Moss  tracy.moss@waynesanderson.com |
| | Email Notification,  Toni Bynum  toni.bynum@waynesanderson.com |
| | Email Notification,  Zachary Grant  zachary.grant@waynesanderson.com |
| | Email Notification,  Mason Wood  mason.wood@waynesanderson.com |
| **REGISTERED AGENT CONTACT:** | C T Corporation System |
| | 2 North Jackson Street |
| | Suite 605 |
| | Montgomery, AL 36104 |
| | 866-401-8252 |
| | LargeCorporationTeam@wolterskluwer.com |

The information contained in this Transmittal is provided by CT for quick reference only. It does not constitute a legal opinion, and should not otherwise be relied on, as to the nature of action, the amount of damages, the answer date, or any other information contained in the included documents. The recipient(s) of this form is responsible for reviewing and interpreting the included documents and taking appropriate action, including consulting with its legal and other advisors as necessary. CT

**EXHIBIT**

**2**



disclaims all liability for the information contained in this form, including for any omissions or inaccuracies that may be contained therein.

PAIGE SMITH
P.O. BOX 219
CLAYTON AL 36016

**0.6 LBS LTR**    **1 OF 1**

**SHIP TO:**
WAYNE FARMS, LLC
2 N JACKSON STREET, SUITE 605
C/O CT CORPORATION SYSTEM
**MONTGOMERY  AL  36104**

## AL 360 9-02

**UPS 2ND DAY AIR**    **2**
TRACKING #: 1Z E75 G49 A6 1471 6821

BILLING: 3RD PARTY
ADULT SIGNATURE REQUIRED-MIN 21

Trx Ref No.: 6a896376-d4ee-4db2-96f4-2d280d2f582

XOL 25.10.20    NV45 51.0A 12/2025*

FOLD HERE

## View/Print Label

1  **Print the label:** Select Print from the File menu in this browser window to print the label below.

2  **Fold the printed label at the dotted line.** Place the label in a UPS Shipping Pouch. If you do not have a pouch, affix the folded label using clear plastic shipping tape over the entire label.

3  **GETTING YOUR SHIPMENT TO UPS**

o  Air shipments (including Worldwide Express and Expedited) can be picked up or dropped off. To schedule a pickup, or to find a drop-off location, select the Pickup or Drop-off icon from the UPS tool bar.

o  Take this package to any location of The UPS Store®, UPS Drop Box, UPS Customer Center, UPS Alliances (Office Depot® or Staples®) or Authorized Shipping Outlet near you or visit www.ups.com/content/us/en/index.jsx and select Drop Off.

DOCUMENT 3

# IN THE CIRCUIT COURT OF BARBOUR COUNTY, ALABAMA
## CIVIL ACTION NO. 06-CV-2025-900048.00

**ALEXIS BIANCA ADAMS, Plaintiff**

v.

**WAYNE FARMS, LLC, Defendant**

### SUMMONS

This service by commercial carrier of this summons is initiated upon the written request of Plaintiff's attorney pursuant to the Alabama Rules of Civil Procedure.

NOTICE TO  WAYNE FARMS, LLC, C/O CT CORPORATION SYSTEM 2 N JACKSON

The Complaint which is attached to this summons is important and you must take immediate action to protect your rights. You are required to mail or hand deliver a copy of a written Answer, either admitting or denying each allegation in the Complaint, to Carolyn Elizabeth Littell, the lawyer for the Plaintiff(s), whose address is:

PO Box 350, Union Springs, AL 36089

THIS ANSWER MUST BE MAILED OR DELIVERED WITHIN THIRTY (30) DAYS FROM THE DATE OF DELIVERY OF THIS SUMMONS AND COMPLAINT AS EVIDENCED BY THE RETURN RECEIPT, OR A JUDGMENT BY DEFAULT MAY BE ENTERED AGAINST YOU FOR THE MONEY OR OTHER THINGS DEMANDED IN THE COMPLAINT. You must also file the original of your Answer with the Clerk of this Court within a reasonable time afterward.

/s/ PAIGE SMITH

Clerk of Court

Dated: 12/15/2025

ELECTRONICALLY FILED
12/15/2025 1:00 PM
06-CV-2025-900048.00
CIRCUIT COURT OF
BARBOUR COUNTY, ALABAMA
PAIGE SMITH, CLERK

| State of Alabama<br>Unified Judicial System<br><br>Form ARCiv-93  Rev. 9/25 | **COVER SHEET**<br>**CIRCUIT COURT - CIVIL CASE**<br>(Not For Domestic Relations Cases) | Case Number:<br>06<br><br>Date of Filing:<br>12/15/2025 | Judge Code: |

## GENERAL INFORMATION

### IN THE CIRCUIT COURT OF BARBOUR COUNTY, ALABAMA
### ALEXIS BIANCA ADAMS ET AL v. AGRI STATS, INC. ET AL

**First Plaintiff:** ☐ Business ☑ Individual  **First Defendant:** ☑ Business ☐ Individual
☐ Government ☐ Other  ☐ Government ☐ Other

**NATURE OF SUIT:** Select primary cause of action, by checking box (check only one) that best characterizes your action:

**TORTS: PERSONAL INJURY**
- ☐ WDEA - Wrongful Death
- ☐ TONG - Negligence: General
- ☐ TOMV - Negligence: Motor Vehicle
- ☐ TOWA - Wantonness
- ☐ TOPL - Product Liability/AEMLD
- ☐ TOMM - Malpractice-Medical
- ☐ TOLM - Malpractice-Legal
- ☐ TOOM - Malpractice-Other
- ☑ TBFM - Fraud/Bad Faith/Misrepresentation
- ☐ TOXX - Other: _____

**TORTS: PERSONAL INJURY**
- ☐ TOPE - Personal Property
- ☐ TORE - Real Property

**OTHER CIVIL FILINGS**
- ☐ ABAN - Abandoned Automobile
- ☐ ACCT - Account & Nonmortgage
- ☐ APAA - Administrative Agency Appeal
- ☐ ADPA - Administrative Procedure Act
- ☐ ANPS - Adults in Need of Protective Service

**OTHER CIVIL FILINGS (cont'd)**
- ☐ MSXX - Birth/Death Certificate Modification/Bond Forfeiture Appeal/ Enforcement of Agency Subpoena/Petition to Preserve
- ☐ CVRT - Civil Rights
- ☐ COND - Condemnation/Eminent Domain/Right-of-Way
- ☐ CTMP - Contempt of Court
- ☐ CONT - Contract/Ejectment/Writ of Seizure
- ☐ TOCN - Conversion
- ☐ EQND - Equity Non-Damages Actions/Declaratory Judgment/ Injunction Election Contest/Quiet Title/Sale For Division
- ☐ CVUD - Eviction Appeal/Unlawful Detainer
- ☐ FORJ - Foreign Judgment
- ☐ FORF - Fruits of Crime Forfeiture
- ☐ MSHC - Habeas Corpus/Extraordinary Writ/Mandamus/Prohibition
- ☐ PFAB - Protection From Abuse
- ☐ EPFA - Elder Protection From Abuse
- ☐ QTLB - Quiet Title Land Bank
- ☐ FELA - Railroad/Seaman (FELA)
- ☐ RPRO - Real Property
- ☐ WTEG - Will/Trust/Estate/Guardianship/Conservatorship
- ☐ COMP - Workers' Compensation
- ☐ CVXX - Miscellaneous Circuit Civil Case

**ORIGIN:** F ☑ INITIAL FILING    P ☐ APPEAL FROM PROBATE COURT

A ☐ APPEAL FROM DISTRICT COURT    O ☐ OTHER

**HAS JURY TRIAL BEEN DEMANDED?** ☑ YES ☐ NO    Note: Checking "Yes" does not constitute a demand for a jury trial. (See Rules 38 and 39, Ala.R.Civ.P, for procedure)

**RELIEF REQUESTED:** ☑ MONETARY AWARD REQUESTED ☐ NO MONETARY AWARD REQUESTED

**ATTORNEY CODE:**
LIT028

12/15/2025 1:00:46 PM
Date

/s/ Carolyn Elizabeth Littell
Signature of Attorney/Party filing this form

**MEDIATION REQUESTED:** ☐ YES ☑ NO ☐ UNDECIDED

**Election to Proceed under the Alabama Rules for Expedited Civil Actions:** ☐ YES ☑ NO

ELECTRONICALLY FILED
12/15/2025 1:00 PM
06-CV-2025-900048.00
CIRCUIT COURT OF
BARBOUR COUNTY, ALABAMA
PAIGE SMITH, CLERK

IN THE CIRCUIT COURT OF
BARBOUR COUNTY, ALABAMA
CLAYTON DIVISION

ALEXIS BIANCA ADAMS; CHRISTAL
DENISE ANGLIN; CHRISTOPHER LEMONT
ANGLIN; JAMES ELBERT ANGLIN JR;
DEVAN TAMAR BAXTE; BRUCE
CODERRICK BAXTER; DENISE
BLACKMON; ARTHUR LEE BLAKELY, JR.;
JAMES  BOSWELL, JR.; BETTY JO BOYKIN;
EZEKEL  BOYKIN; ALFREDA M BURKS;
BETTY ANN BURKS; BRUCE BURKS;
ANDREW CAREY; DORIS M. CAREY;
DANNY LEE CHAMBERS; ISOM RAKEEM
DAFFIN; BOBBY DANIELS; CAROLYN
WHIGHAM DANIELS; CORDARYLL
DYSHAWN DANIELS; FREDERICK
DANIELS; JACQUELINE S. DAVIS; JASMINE
RAYDEN DAVIS; CHERRY ANN DEVOSE;
DEMETRIC L DEVOSE; AMANDA
SANTORIA EUTSEY; DERRIS KENTRELL
EUTSEY; ANDREW L FORD; FELICIA
DENISE FORD; BOBBIE JEAN FREEMAN;
ANGELO TERRELL GILBERT; APRIAL
LATRECE GRIMSLEY; BRANDON GUICE;
FELICIA MICHELLE GULLETTE; DEVIN
DEVOR HAMILTON; DONNIE DANYEL
HAMILTON; GRADEAN HICKS; ELOIS
HILL; FLOYD HILL; BRIANA LENAI HOBDY;
CHRISTOPHER DWAYNE JACKSON;
ANTHONY ANTWAN JOHNSON; BRENDA
NETTER JOHNSON; CHRISTOPHER JAMAR
JONES; ISAAC ANTIONE JONES; CHARLES
E. KENNEDY; ERIC DEON KENNEDY;
ANTOINE LAMETRIUS KING WALKER;
EVELYN KENNEDY LAMPLEY; CELICIA K
LEDBETTER; CHARLIE LOHMAN; CHELSEA
RAQUEL LOHMAN; COREY JAMAR
LOHMAN; GEORGIA LEE MARSHALL;

1

JAMES CARL MASSEY, JR.; DANIEL LEE
MCCLENDON; BARBARA KATE MCCOY;
ANGIE BIANCA MCKINNON; ANTHONY
MCKINNON; DONTAVIOUS QUANTREL
PAIGE; BETTY JEAN PEARISON; JARVIUS
PERSON; BENJAMIN PHILLIPS; GARY
WAYNE PRATT JR.; ARLEASIA JUANARIA
REDDING; JAMES MARRIN REDDING;
GLADYS VIRGINIA RODGERS; CHARLIE
LEE RUMPH; CHIQUITA TEQUILA RUMPH;
D'ANDREA DENISE RUMPH; ELOIS E
RUMPH; FELICIA MICHELLE RUSSAW;
FREDERICK MONTA RUSSAW; GOODLOW
RUSSAW; ANNIE LUE RUSSAW MCCOY;
ALEANE SCARVER; ALESHA RENEE
SCARVER; EDWARD MORRIS SCARVER;
DENEKKA KEMKISHA STARKS;
CATRINNA KYLES TANNIRU; BARBARA
LANELL TEW; DONNIE BERNARD
THOMAS; FREDDIE B. THOMAS; FREDDIE
RAMONE THOMAS; CHAKA YOLANDA
THOMPKINS; JAMES CALVIN VICKERS;
BOBBIE REE WALKER; CHARLES EDWARD
WHITE; CHARLIE MAE WRIGHT; GLENDA
F. YOUNG

    *Plaintiffs,*

    v.

AGRI STATS, INC.; PERDUE FARMS, INC.;
PERDUE FOODS, LLC; TYSON FOODS, INC.,
is successor to KEYSTONE FOODS, LLC;
EQUITY GROUP, and CHAROEN
PHOPKHAND; FOODS; PILGRIM'S PRIDE
CORPORATION; WAYNE FARMS, LLC;
WAYNE-SANDERSON FARMS, LLC, the
successor entity resulting from the merger of
Sanderson Farms, Inc. and Wayne Farms, LLC;
CARGILL MEAT SOLUTIONS, INC.;

CIVIL ACTION NO. CV-

COMPLAINT

Jury Trial Demand

2

CONTINENTAL GRAIN COMPANY; PECO
FOODS, INC.; FOSTER POULTRY FARMS,
LLC; Fictitious Defendant A-BB,

   *Defendants.*

## COMPLAINT

    **COME NOW** the plaintiffs in the above styled cause and bring this action against the defendants, named and fictitious as says unto the Court as follows:

### INTRODUCTION

1. This action is brought to remedy a secret, multi-decade conspiracy orchestrated by America's largest poultry processing companies. While holding themselves out to the public as fierce competitors, these corporate giants privately colluded to systematically fix, depress, and stabilize the compensation paid to hundreds of thousands of their most vulnerable employees.

2. Through "off the books" meetings, illicit exchanges of competitively sensitive data facilitated by consulting firms, and direct plant-to-plant communications, the defendants formed an unlawful cartel to suppress labor costs and maximize their own profits. This conduct, which resulted in artificially depressed wages and benefits for the plaintiffs and other workers, constitutes a flagrant and ongoing violation of the laws of the State of Alabama.

### JURISDICTION AND VENUE

1. This Court has subject matter jurisdiction over the claims asserted herein pursuant to the laws and Constitution of the State of Alabama.

2. Venue is proper in Barbour County, Alabama, pursuant to   as one or more of the defendants transact or during the relevant time period transacted business within this jurisdiction, regularly, systemically and actively, and the wrongful acts and omissions alleged herein occurred in or had substantial effects within this county, including the plaintiffs.

3. The amount in controversy for each individual plaintiff is no more than $74,999.99 per Plaintiff.

3

## PARTIES

**Plaintiffs**

1. Plaintiff, ALEXIS BIANCA ADAMS, is a citizen and resident of the State of Alabama. During the relevant period, Plaintiff was employed by one or more of the defendant Processors. As a direct and proximate result of the defendants' unlawful conduct, they suffered economic damages in the form of suppressed wages and benefits, as well as severe emotional distress.

2. Plaintiff, CHRISTAL DENISE ANGLIN, is a citizen and resident of the State of Alabama. During the relevant period, Plaintiff was employed by one or more of the defendant Processors. As a direct and proximate result of the defendants' unlawful conduct, they suffered economic damages in the form of suppressed wages and benefits, as well as severe emotional distress.

3. Plaintiff, CHRISTOPHER LEMONT ANGLIN, is a citizen and resident of the State of Alabama. During the relevant period, Plaintiff was employed by one or more of the defendant Processors. As a direct and proximate result of the defendants' unlawful conduct, they suffered economic damages in the form of suppressed wages and benefits, as well as severe emotional distress.

4. Plaintiff, JAMES ELBERT ANGLIN JR.,  is a citizen and resident of the State of Alabama. During the relevant period, Plaintiff was employed by one or more of the defendant Processors. As a direct and proximate result of the defendants' unlawful conduct, they suffered economic damages in the form of suppressed wages and benefits, as well as severe emotional distress.

5. Plaintiff, DEVAN TAMAR BAXTE, is a citizen and resident of the State of Alabama. During the relevant period, Plaintiff was employed by one or more of the defendant Processors. As a direct and proximate result of the defendants' unlawful conduct, they suffered economic damages in the form of suppressed wages and benefits, as well as severe emotional distress.

6. Plaintiff, BRUCE CODERRICK BAXTER, is a citizen and resident of the State of Alabama. During the relevant period, Plaintiff was employed by one or more of the defendant Processors. As a direct and proximate result of the defendants'

4

unlawful conduct, they suffered economic damages in the form of suppressed wages and benefits, as well as severe emotional distress.

7.  Plaintiff, DENISE BLACKMON, is a citizen and resident of the State of Alabama. During the relevant period, Plaintiff was employed by one or more of the defendant Processors. As a direct and proximate result of the defendants' unlawful conduct, they suffered economic damages in the form of suppressed wages and benefits, as well as severe emotional distress.

8.  Plaintiff, ARTHUR LEE BLAKELY, JR., is a citizen and resident of the State of Alabama. During the relevant period, Plaintiff was employed by one or more of the defendant Processors. As a direct and proximate result of the defendants' unlawful conduct, they suffered economic damages in the form of suppressed wages and benefits, as well as severe emotional distress.

9.  Plaintiff, JAMES BOSWELL, JR.,   is a citizen and resident of the State of Alabama. During the relevant period, Plaintiff was employed by one or more of the defendant Processors. As a direct and proximate result of the defendants' unlawful conduct, they suffered economic damages in the form of suppressed wages and benefits, as well as severe emotional distress.

10. Plaintiff, BETTY JO BOYKIN, is a citizen and resident of the State of Alabama. During the relevant period, Plaintiff was employed by one or more of the defendant Processors. As a direct and proximate result of the defendants' unlawful conduct, they suffered economic damages in the form of suppressed wages and benefits, as well as severe emotional distress.

11. Plaintiff, EZEKEL BOYKIN, is a citizen and resident of the State of Alabama. During the relevant period, Plaintiff was employed by one or more of the defendant Processors. As a direct and proximate result of the defendants' unlawful conduct, they suffered economic damages in the form of suppressed wages and benefits, as well as severe emotional distress.

12. Plaintiff, ALFREDA M BURKS, is a citizen and resident of the State of Alabama. During the relevant period, Plaintiff was employed by one or more of the defendant Processors. As a direct and proximate result of the defendants' unlawful conduct, they suffered economic damages in the form of suppressed wages and benefits, as well as severe emotional distress.

13. Plaintiff, BETTY ANN BURKS, is a citizen and resident of the State of Alabama. During the relevant period, Plaintiff was employed by one or more of the defendant Processors. As a direct and proximate result of the defendants' unlawful conduct, they suffered economic damages in the form of suppressed wages and benefits, as well as severe emotional distress.

14. Plaintiff, BRUCE BURKS, is a citizen and resident of the State of Alabama. During the relevant period, Plaintiff was employed by one or more of the defendant Processors. As a direct and proximate result of the defendants' unlawful conduct, they suffered economic damages in the form of suppressed wages and benefits, as well as severe emotional distress.

15. Plaintiff, ANDREW CAREY, is a citizen and resident of the State of Alabama. During the relevant period, Plaintiff was employed by one or more of the defendant Processors. As a direct and proximate result of the defendants' unlawful conduct, they suffered economic damages in the form of suppressed wages and benefits, as well as severe emotional distress.

16. Plaintiff, DORIS M CAREY, is a citizen and resident of the State of Alabama. During the relevant period, Plaintiff was employed by one or more of the defendant Processors. As a direct and proximate result of the defendants' unlawful conduct, they suffered economic damages in the form of suppressed wages and benefits, as well as severe emotional distress.

17. Plaintiff, DANNY LEE CHAMBERS, is a citizen and resident of the State of Alabama. During the relevant period, Plaintiff was employed by one or more of the defendant Processors. As a direct and proximate result of the defendants' unlawful conduct, they suffered economic damages in the form of suppressed wages and benefits, as well as severe emotional distress.

18. Plaintiff, ISOM RAKEEM DAFFIN, is a citizen and resident of the State of Alabama. During the relevant period, Plaintiff was employed by one or more of the defendant Processors. As a direct and proximate result of the defendants' unlawful conduct, they suffered economic damages in the form of suppressed wages and benefits, as well as severe emotional distress.

19. Plaintiff, BOBBY DANIELS, is a citizen and resident of the State of Alabama. During the relevant period, Plaintiff was employed by one or more of the

6

defendant Processors. As a direct and proximate result of the defendants' unlawful conduct, they suffered economic damages in the form of suppressed wages and benefits, as well as severe emotional distress.

20. Plaintiff, CAROLYN WHIGHAM DANIELS, is a citizen and resident of the State of Alabama. During the relevant period, Plaintiff was employed by one or more of the defendant Processors. As a direct and proximate result of the defendants' unlawful conduct, they suffered economic damages in the form of suppressed wages and benefits, as well as severe emotional distress.

21. Plaintiff, CORDARYLL DYSHAWN DANIELS, is a citizen and resident of the State of Alabama. During the relevant period, Plaintiff was employed by one or more of the defendant Processors. As a direct and proximate result of the defendants' unlawful conduct, they suffered economic damages in the form of suppressed wages and benefits, as well as severe emotional distress.

22. Plaintiff, FREDERICK DANIELS, is a citizen and resident of the State of Alabama. During the relevant period, Plaintiff was employed by one or more of the defendant Processors. As a direct and proximate result of the defendants' unlawful conduct, they suffered economic damages in the form of suppressed wages and benefits, as well as severe emotional distress.

23. Plaintiff, JACQUELINE S. DAVIS, is a citizen and resident of the State of Alabama. During the relevant period, Plaintiff was employed by one or more of the defendant Processors. As a direct and proximate result of the defendants' unlawful conduct, they suffered economic damages in the form of suppressed wages and benefits, as well as severe emotional distress.

24. Plaintiff, JASMINE RAYDEN DAVIS, is a citizen and resident of the State of Alabama. During the relevant period, Plaintiff was employed by one or more of the defendant Processors. As a direct and proximate result of the defendants' unlawful conduct, they suffered economic damages in the form of suppressed wages and benefits, as well as severe emotional distress.

25. Plaintiff, CHERRY ANN DEVOSE, is a citizen and resident of the State of Alabama. During the relevant period, Plaintiff was employed by one or more of the defendant Processors. As a direct and proximate result of the defendants' unlawful

7

conduct, they suffered economic damages in the form of suppressed wages and benefits, as well as severe emotional distress.

26. Plaintiff, DEMETRIC L. DEVOSE, is a citizen and resident of the State of Alabama. During the relevant period, Plaintiff was employed by one or more of the defendant Processors. As a direct and proximate result of the defendants' unlawful conduct, they suffered economic damages in the form of suppressed wages and benefits, as well as severe emotional distress.

27. Plaintiff, AMANDA SANTORIA EUTSEY, is a citizen and resident of the State of Alabama. During the relevant period, Plaintiff was employed by one or more of the defendant Processors. As a direct and proximate result of the defendants' unlawful conduct, they suffered economic damages in the form of suppressed wages and benefits, as well as severe emotional distress.

28. Plaintiff, DERRIS KENTRELL EUTSEY, is a citizen and resident of the State of Alabama. During the relevant period, Plaintiff was employed by one or more of the defendant Processors. As a direct and proximate result of the defendants' unlawful conduct, they suffered economic damages in the form of suppressed wages and benefits, as well as severe emotional distress.

29. Plaintiff, ANDREW L FORD, is a citizen and resident of the State of Alabama. During the relevant period, Plaintiff was employed by one or more of the defendant Processors. As a direct and proximate result of the defendants' unlawful conduct, they suffered economic damages in the form of suppressed wages and benefits, as well as severe emotional distress.

30. Plaintiff, FELICIA DENISE FORD, is a citizen and resident of the State of Alabama. During the relevant period, Plaintiff was employed by one or more of the defendant Processors. As a direct and proximate result of the defendants' unlawful conduct, they suffered economic damages in the form of suppressed wages and benefits, as well as severe emotional distress.

31. Plaintiff, BOBBIE JEAN FREEMAN, is a citizen and resident of the State of Alabama. During the relevant period, Plaintiff was employed by one or more of the defendant Processors. As a direct and proximate result of the defendants' unlawful conduct, they suffered economic damages in the form of suppressed wages and benefits, as well as severe emotional distress.

32. Plaintiff, ANGELO TERRELL GILBERT, is a citizen and resident of the State of Alabama. During the relevant period, Plaintiff was employed by one or more of the defendant Processors. As a direct and proximate result of the defendants' unlawful conduct, they suffered economic damages in the form of suppressed wages and benefits, as well as severe emotional distress.

33. Plaintiff, APRIAL LATRECE GRIMSLEY, is a citizen and resident of the State of Alabama. During the relevant period, Plaintiff was employed by one or more of the defendant Processors. As a direct and proximate result of the defendants' unlawful conduct, they suffered economic damages in the form of suppressed wages and benefits, as well as severe emotional distress.

34. Plaintiff, BRANDON GUICE, is a citizen and resident of the State of Alabama. During the relevant period, Plaintiff was employed by one or more of the defendant Processors. As a direct and proximate result of the defendants' unlawful conduct, they suffered economic damages in the form of suppressed wages and benefits, as well as severe emotional distress.

35. Plaintiff, FELICIA MICHELLE GULLETTE, is a citizen and resident of the State of Alabama. During the relevant period, Plaintiff was employed by one or more of the defendant Processors. As a direct and proximate result of the defendants' unlawful conduct, they suffered economic damages in the form of suppressed wages and benefits, as well as severe emotional distress.

36. Plaintiff, DEVIN DEVOR HAMILTON, is a citizen and resident of the State of Alabama. During the relevant period, Plaintiff was employed by one or more of the defendant Processors. As a direct and proximate result of the defendants' unlawful conduct, they suffered economic damages in the form of suppressed wages and benefits, as well as severe emotional distress.

37. Plaintiff, DONNIE DANYEL HAMILTON, is a citizen and resident of the State of Alabama. During the relevant period, Plaintiff was employed by one or more of the defendant Processors. As a direct and proximate result of the defendants' unlawful conduct, they suffered economic damages in the form of suppressed wages and benefits, as well as severe emotional distress.

38. Plaintiff, GRADEAN HICKS, is a citizen and resident of the State of Alabama. During the relevant period, Plaintiff was employed by one or more of the

defendant Processors. As a direct and proximate result of the defendants' unlawful conduct, they suffered economic damages in the form of suppressed wages and benefits, as well as severe emotional distress.

39. Plaintiff, ELOIS HILL, is a citizen and resident of the State of Alabama. During the relevant period, Plaintiff was employed by one or more of the defendant Processors. As a direct and proximate result of the defendants' unlawful conduct, they suffered economic damages in the form of suppressed wages and benefits, as well as severe emotional distress.

40. Plaintiff, FLOYD HILL, is a citizen and resident of the State of Alabama. During the relevant period, Plaintiff was employed by one or more of the defendant Processors. As a direct and proximate result of the defendants' unlawful conduct, they suffered economic damages in the form of suppressed wages and benefits, as well as severe emotional distress.

41. Plaintiff, BRIANA LENAI HOBDY, is a citizen and resident of the State of Alabama. During the relevant period, Plaintiff was employed by one or more of the defendant Processors. As a direct and proximate result of the defendants' unlawful conduct, they suffered economic damages in the form of suppressed wages and benefits, as well as severe emotional distress.

42. Plaintiff, CHRISTOPHER DWAYNE JACKSON, is a citizen and resident of the State of Alabama. During the relevant period, Plaintiff was employed by one or more of the defendant Processors. As a direct and proximate result of the defendants' unlawful conduct, they suffered economic damages in the form of suppressed wages and benefits, as well as severe emotional distress.

43. Plaintiff, ANTHONY ANTWAN JOHNSON, is a citizen and resident of the State of Alabama. During the relevant period, Plaintiff was employed by one or more of the defendant Processors. As a direct and proximate result of the defendants' unlawful conduct, they suffered economic damages in the form of suppressed wages and benefits, as well as severe emotional distress.

44. Plaintiff, BRENDA NETTER JOHNSON, is a citizen and resident of the State of Alabama. During the relevant period, Plaintiff was employed by one or more of the defendant Processors. As a direct and proximate result of the defendants'

10

unlawful conduct, they suffered economic damages in the form of suppressed wages and benefits, as well as severe emotional distress.

45. Plaintiff, CHRISTOPHER JAMAR JONES, is a citizen and resident of the State of Alabama. During the relevant period, Plaintiff was employed by one or more of the defendant Processors. As a direct and proximate result of the defendants' unlawful conduct, they suffered economic damages in the form of suppressed wages and benefits, as well as severe emotional distress.

46. Plaintiff, ISAAC ANTIONE JONES, is a citizen and resident of the State of Alabama. During the relevant period, Plaintiff was employed by one or more of the defendant Processors. As a direct and proximate result of the defendants' unlawful conduct, they suffered economic damages in the form of suppressed wages and benefits, as well as severe emotional distress.

47. Plaintiff, CHARLES E KENNEDY, is a citizen and resident of the State of Alabama. During the relevant period, Plaintiff was employed by one or more of the defendant Processors. As a direct and proximate result of the defendants' unlawful conduct, they suffered economic damages in the form of suppressed wages and benefits, as well as severe emotional distress.

48. Plaintiff, ERIC DEON KENNEDY, is a citizen and resident of the State of Alabama. During the relevant period, Plaintiff was employed by one or more of the defendant Processors. As a direct and proximate result of the defendants' unlawful conduct, they suffered economic damages in the form of suppressed wages and benefits, as well as severe emotional distress.

49. Plaintiff, ANTOINE LAMETRIUS KING WALKER, is a citizen and resident of the State of Alabama. During the relevant period, Plaintiff was employed by one or more of the defendant Processors. As a direct and proximate result of the defendants' unlawful conduct, they suffered economic damages in the form of suppressed wages and benefits, as well as severe emotional distress.

50. Plaintiff, EVELYN KENNEDY LAMPLEY, is a citizen and resident of the State of Alabama. During the relevant period, Plaintiff was employed by one or more of the defendant Processors. As a direct and proximate result of the defendants' unlawful conduct, they suffered economic damages in the form of suppressed wages and benefits, as well as severe emotional distress.

51. Plaintiff, CELICIA K LEDBETTER, is a citizen and resident of the State of Alabama. During the relevant period, Plaintiff was employed by one or more of the defendant Processors. As a direct and proximate result of the defendants' unlawful conduct, they suffered economic damages in the form of suppressed wages and benefits, as well as severe emotional distress.

52. Plaintiff, CHARLIE LOHMAN, is a citizen and resident of the State of Alabama. During the relevant period, Plaintiff was employed by one or more of the defendant Processors. As a direct and proximate result of the defendants' unlawful conduct, they suffered economic damages in the form of suppressed wages and benefits, as well as severe emotional distress.

53. Plaintiff, CHELSEA RAQUEL LOHMAN, is a citizen and resident of the State of Alabama. During the relevant period, Plaintiff was employed by one or more of the defendant Processors. As a direct and proximate result of the defendants' unlawful conduct, they suffered economic damages in the form of suppressed wages and benefits, as well as severe emotional distress.

54. Plaintiff, COREY JAMAR LOHMAN, is a citizen and resident of the State of Alabama. During the relevant period, Plaintiff was employed by one or more of the defendant Processors. As a direct and proximate result of the defendants' unlawful conduct, they suffered economic damages in the form of suppressed wages and benefits, as well as severe emotional distress.

55. Plaintiff, GEORGIA LEE MARSHALL, is a citizen and resident of the State of Alabama. During the relevant period, Plaintiff was employed by one or more of the defendant Processors. As a direct and proximate result of the defendants' unlawful conduct, they suffered economic damages in the form of suppressed wages and benefits, as well as severe emotional distress.

56. Plaintiff, JAMES CARL MASSEY, JR., is a citizen and resident of the State of Alabama. During the relevant period, Plaintiff was employed by one or more of the defendant Processors. As a direct and proximate result of the defendants' unlawful conduct, they suffered economic damages in the form of suppressed wages and benefits, as well as severe emotional distress.

57. Plaintiff, DANIEL LEE MCCLENDON, is a citizen and resident of the State of Alabama. During the relevant period, Plaintiff was employed by one or more of

the defendant Processors. As a direct and proximate result of the defendants' unlawful conduct, they suffered economic damages in the form of suppressed wages and benefits, as well as severe emotional distress.

58. Plaintiff, BARBARA KATE MCCOY, is a citizen and resident of the State of Alabama. During the relevant period, Plaintiff was employed by one or more of the defendant Processors. As a direct and proximate result of the defendants' unlawful conduct, they suffered economic damages in the form of suppressed wages and benefits, as well as severe emotional distress.

59. Plaintiff, ANGIE BIANCA MCKINNON, is a citizen and resident of the State of Alabama. During the relevant period, Plaintiff was employed by one or more of the defendant Processors. As a direct and proximate result of the defendants' unlawful conduct, they suffered economic damages in the form of suppressed wages and benefits, as well as severe emotional distress.

60. Plaintiff, ANTHONY MCKINNON, is a citizen and resident of the State of Alabama. During the relevant period, Plaintiff was employed by one or more of the defendant Processors. As a direct and proximate result of the defendants' unlawful conduct, they suffered economic damages in the form of suppressed wages and benefits, as well as severe emotional distress.

61. Plaintiff, DONTAVIOUS QUANTREL PAIGE, is a citizen and resident of the State of Alabama. During the relevant period, Plaintiff was employed by one or more of the defendant Processors. As a direct and proximate result of the defendants' unlawful conduct, they suffered economic damages in the form of suppressed wages and benefits, as well as severe emotional distress.

62. Plaintiff, BETTY JEAN PEARISON, is a citizen and resident of the State of Alabama. During the relevant period, Plaintiff was employed by one or more of the defendant Processors. As a direct and proximate result of the defendants' unlawful conduct, they suffered economic damages in the form of suppressed wages and benefits, as well as severe emotional distress.

63. Plaintiff, JARVIUS PERSON, is a citizen and resident of the State of Alabama. During the relevant period, Plaintiff was employed by one or more of the defendant Processors. As a direct and proximate result of the defendants' unlawful

conduct, they suffered economic damages in the form of suppressed wages and benefits, as well as severe emotional distress.

64. Plaintiff, BENJAMIN PHILLIPS, is a citizen and resident of the State of Alabama. During the relevant period, Plaintiff was employed by one or more of the defendant Processors. As a direct and proximate result of the defendants' unlawful conduct, they suffered economic damages in the form of suppressed wages and benefits, as well as severe emotional distress.

65. Plaintiff, GARY WAYNE PRATT JR., is a citizen and resident of the State of Alabama. During the relevant period, Plaintiff was employed by one or more of the defendant Processors. As a direct and proximate result of the defendants' unlawful conduct, they suffered economic damages in the form of suppressed wages and benefits, as well as severe emotional distress.

66. Plaintiff, ARLEASIA JUANARIA REDDING, is a citizen and resident of the State of Alabama. During the relevant period, Plaintiff was employed by one or more of the defendant Processors. As a direct and proximate result of the defendants' unlawful conduct, they suffered economic damages in the form of suppressed wages and benefits, as well as severe emotional distress.

67. Plaintiff, JAMES MARRIN REDDING, is a citizen and resident of the State of Alabama. During the relevant period, Plaintiff was employed by one or more of the defendant Processors. As a direct and proximate result of the defendants' unlawful conduct, they suffered economic damages in the form of suppressed wages and benefits, as well as severe emotional distress.

68. Plaintiff, GLADYS VIRGINIA RODGERS, is a citizen and resident of the State of Alabama. During the relevant period, Plaintiff was employed by one or more of the defendant Processors. As a direct and proximate result of the defendants' unlawful conduct, they suffered economic damages in the form of suppressed wages and benefits, as well as severe emotional distress.

69. Plaintiff, CHARLIE LEE RUMPH, is a citizen and resident of the State of Alabama. During the relevant period, Plaintiff was employed by one or more of the defendant Processors. As a direct and proximate result of the defendants' unlawful conduct, they suffered economic damages in the form of suppressed wages and benefits, as well as severe emotional distress.

14

70. Plaintiff, CHIQUITA TEQUILA RUMPH, is a citizen and resident of the State of Alabama. During the relevant period, Plaintiff was employed by one or more of the defendant Processors. As a direct and proximate result of the defendants' unlawful conduct, they suffered economic damages in the form of suppressed wages and benefits, as well as severe emotional distress.

71. Plaintiff, D'ANDREA DENISE RUMPH, is a citizen and resident of the State of Alabama. During the relevant period, Plaintiff was employed by one or more of the defendant Processors. As a direct and proximate result of the defendants' unlawful conduct, they suffered economic damages in the form of suppressed wages and benefits, as well as severe emotional distress.

72. Plaintiff, ELOIS E. RUMPH, is a citizen and resident of the State of Alabama. During the relevant period, Plaintiff was employed by one or more of the defendant Processors. As a direct and proximate result of the defendants' unlawful conduct, they suffered economic damages in the form of suppressed wages and benefits, as well as severe emotional distress.

73. Plaintiff, FELICIA MICHELLE RUSSAW, is a citizen and resident of the State of Alabama. During the relevant period, Plaintiff was employed by one or more of the defendant Processors. As a direct and proximate result of the defendants' unlawful conduct, they suffered economic damages in the form of suppressed wages and benefits, as well as severe emotional distress.

74. Plaintiff, FREDERICK MONTA RUSSAW, is a citizen and resident of the State of Alabama. During the relevant period, Plaintiff was employed by one or more of the defendant Processors. As a direct and proximate result of the defendants' unlawful conduct, they suffered economic damages in the form of suppressed wages and benefits, as well as severe emotional distress.

75. Plaintiff, GOODLOW RUSSAW, is a citizen and resident of the State of Alabama. During the relevant period, Plaintiff was employed by one or more of the defendant Processors. As a direct and proximate result of the defendants' unlawful conduct, they suffered economic damages in the form of suppressed wages and benefits, as well as severe emotional distress.

76. Plaintiff, ANNIE LUE RUSSAW MCCOY, is a citizen and resident of the State of Alabama. During the relevant period, Plaintiff was employed by one or more of

the defendant Processors. As a direct and proximate result of the defendants' unlawful conduct, they suffered economic damages in the form of suppressed wages and benefits, as well as severe emotional distress.

77. Plaintiff, ALEANE SCARVER, is a citizen and resident of the State of Alabama. During the relevant period, Plaintiff was employed by one or more of the defendant Processors. As a direct and proximate result of the defendants' unlawful conduct, they suffered economic damages in the form of suppressed wages and benefits, as well as severe emotional distress.

78. Plaintiff, ALESHA RENEE SCARVER, is a citizen and resident of the State of Alabama. During the relevant period, Plaintiff was employed by one or more of the defendant Processors. As a direct and proximate result of the defendants' unlawful conduct, they suffered economic damages in the form of suppressed wages and benefits, as well as severe emotional distress.

79. Plaintiff, EDWARD MORRIS SCARVER, is a citizen and resident of the State of Alabama. During the relevant period, Plaintiff was employed by one or more of the defendant Processors. As a direct and proximate result of the defendants' unlawful conduct, they suffered economic damages in the form of suppressed wages and benefits, as well as severe emotional distress.

80. Plaintiff, DENEKKA KEMKISHA STARKS, is a citizen and resident of the State of Alabama. During the relevant period, Plaintiff was employed by one or more of the defendant Processors. As a direct and proximate result of the defendants' unlawful conduct, they suffered economic damages in the form of suppressed wages and benefits, as well as severe emotional distress.

81. Plaintiff, CATRINNA KYLES TANNIRU, is a citizen and resident of the State of Alabama. During the relevant period, Plaintiff was employed by one or more of the defendant Processors. As a direct and proximate result of the defendants' unlawful conduct, they suffered economic damages in the form of suppressed wages and benefits, as well as severe emotional distress.

82. Plaintiff, BARBARA LANELL TEW, is a citizen and resident of the State of Alabama. During the relevant period, Plaintiff was employed by one or more of the defendant Processors. As a direct and proximate result of the defendants'

16

unlawful conduct, they suffered economic damages in the form of suppressed wages and benefits, as well as severe emotional distress.

83. Plaintiff, DONNIE BERNARD THOMAS, is a citizen and resident of the State of Alabama. During the relevant period, Plaintiff was employed by one or more of the defendant Processors. As a direct and proximate result of the defendants' unlawful conduct, they suffered economic damages in the form of suppressed wages and benefits, as well as severe emotional distress.

84. Plaintiff, FREDDIE B. THOMAS, is a citizen and resident of the State of Alabama. During the relevant period, Plaintiff was employed by one or more of the defendant Processors. As a direct and proximate result of the defendants' unlawful conduct, they suffered economic damages in the form of suppressed wages and benefits, as well as severe emotional distress.

85. Plaintiff, FREDDIE RAMONE THOMAS, is a citizen and resident of the State of Alabama. During the relevant period, Plaintiff was employed by one or more of the defendant Processors. As a direct and proximate result of the defendants' unlawful conduct, they suffered economic damages in the form of suppressed wages and benefits, as well as severe emotional distress.

86. Plaintiff, CHAKA YOLANDA THOMPKINS, is a citizen and resident of the State of Alabama. During the relevant period, Plaintiff was employed by one or more of the defendant Processors. As a direct and proximate result of the defendants' unlawful conduct, they suffered economic damages in the form of suppressed wages and benefits, as well as severe emotional distress.

87. Plaintiff, JAMES CALVIN VICKERS, is a citizen and resident of the State of Alabama. During the relevant period, Plaintiff was employed by one or more of the defendant Processors. As a direct and proximate result of the defendants' unlawful conduct, they suffered economic damages in the form of suppressed wages and benefits, as well as severe emotional distress.

88. Plaintiff, BOBBIE REE WALKER, is a citizen and resident of the State of Alabama. During the relevant period, Plaintiff was employed by one or more of the defendant Processors. As a direct and proximate result of the defendants' unlawful conduct, they suffered economic damages in the form of suppressed wages and benefits, as well as severe emotional distress.

89. Plaintiff, CHARLES EDWARD WHITE, is a citizen and resident of the State of Alabama. During the relevant period, Plaintiff was employed by one or more of the defendant Processors. As a direct and proximate result of the defendants' unlawful conduct, they suffered economic damages in the form of suppressed wages and benefits, as well as severe emotional distress.

90. Plaintiff, CHARLIE MAE WRIGHT, is a citizen and resident of the State of Alabama. During the relevant period, Plaintiff was employed by one or more of the defendant Processors. As a direct and proximate result of the defendants' unlawful conduct, they suffered economic damages in the form of suppressed wages and benefits, as well as severe emotional distress.

91. Plaintiff, GLENDA F YOUNG, is a citizen and resident of the State of Alabama. During the relevant period, Plaintiff was employed by one or more of the defendant Processors. As a direct and proximate result of the defendants' unlawful conduct, they suffered economic damages in the form of suppressed wages and benefits, as well as severe emotional distress.

**Defendants**

1. Agri Stats, Inc., is a foreign corporation that actively solicited, serviced and maintained business services and systemically and regularly conducts or conducted business in this jurisdiction, and these business activities directly relate to the damages to the plaintiffs alleged in this action. They actively solicited and maintained business relationships with Alabama-based companies including co-conspirator defendants. They regularly visited the plants of the co-conspirator defendants in this jurisdiction and in Alabama. Agri Stats purposefully availed itself of the benefits and protections of the Alabama market. This was not passive conduct, but rather an active and continuous service provision involving data collection, auditing, and report dissemination to specific clients in the state and direct, physical presence through representatives in this jurisdiction. The harm to the Plaintiffs, receiving artificially depressed wages as a result of Agri Stats' services, contacts and participation in the conspiracy, occurred in Alabama and was directly related to Agri Stats' business activities within the state. Agri Stats provided a service that it knew or should have known directly and negatively impacted the compensation of a large workforce within this jurisdiction.

18

2. Perdue Farms, Inc., Perdue Foods, LLC, (hereinafter collectively referred to as "Perdue" unless otherwise specified") is a foreign corporation that conducts or conducted business in this jurisdiction, purposefully availed itself to the laws, rights and protections of this jurisdiction, contacts within relate to the plaintiffs' claims, their contacts are such as Defendant should reasonably anticipate being subject to this court's jurisdiction.

3. Keystone Foods, LLC, Equity Group, Charoen Phopkhand Foods all K/N/A Tyson Foods, Inc. (collectively  referred to herein as "Tyson" unless otherwise specified) is a foreign corporation that conducts or conducted business in this jurisdiction during the relevant time period, purposefully availed itself to the laws, rights and protections of this jurisdiction, contacts within relate to the plaintiffs' claims, their contacts are such as defendant should reasonably anticipate being subject to this court's jurisdiction.

4. Pilgrim's Pride Corporation, is a foreign corporation that conducts or conducted business in this jurisdiction, purposefully availed itself to the laws, rights and protections of this jurisdiction, contacts within relate to the plaintiffs' claims, their contacts are such as Defendant should reasonably anticipate being subject to this court's jurisdiction.

5. Wayne Farms LLC, Wayne-Sanderson Farms LLC, Sanderson Farms, Inc., (hereinafter collectively referred to as "Sanderson" unless otherwise specified) is a foreign corporation that conducts or conducted business in this jurisdiction, purposefully availed itself to the laws, rights and protections of this jurisdiction, contacts within relate to the plaintiffs' claims, their contacts are such as Defendant should reasonably anticipate being subject to this court's jurisdiction.

6. Cargill Meat Solutions Corporation and Continental Grain Company are foreign corporations that jointly entered into a venture to operate Wayne-Sanderson Farms LLC. Wayne-Sanderson Farms LLC is a foreign limited liability company formed through the merger of Sanderson Farms, Inc. and Wayne Farms LLC. Each of these entities conducts or conducted business in this jurisdiction, has purposefully availed itself of the laws, rights, and protections of the State of Alabama, and has maintained contacts within this forum that directly relate to the

Plaintiffs' claims. Their business activities in Alabama are such that they should reasonably anticipate being subject to the jurisdiction of this Court.

7. Peco Foods, Inc., is a privately held Alabama corporation that conducts or conducted business in Alabama, purposefully availed itself to the laws, rights and protections of this jurisdiction, and their contacts within this jurisdiction relate to the plaintiffs' claims, their contacts are such as Defendant should reasonably anticipate being subject to this court's jurisdiction.

8. Foster Poultry Farms, LLC is a foreign limited liability company that conducts or conducted business in this jurisdiction during the relevant time period, purposefully availed itself to the laws, rights and protections of this jurisdiction, and their contacts within this jurisdiction relate to the plaintiffs' claims, their contacts are such as Defendant should reasonably anticipate being subject to this court's jurisdiction.

9. Fictitious defendants A-G, whether singular or plural, is that person, firm, corporation or entity that was responsible for the defendants' payroll, human resources, accounting and decisions on the setting of employee wages and benefits.

10. Fictitious defendants H-N, whether singular or plural, is that person, firm, corporation or entity that managed, supervised and/or controlled the day-to-day business dealings of the defendant producers' facility at which the plaintiff(s) were employed during the time period relevant to the allegations in this action.

11. Fictitious defendants O-U, whether singular or plural, is that entity or those entities, that individual or those individuals, other than those described above, whose negligence, wantonness, intentional conduct, willfulness, fraud, conspiracy, complicity or other wrongful conduct contributed to the cause of the occurrence made the basis of Plaintiffs' Complaint.

12. Fictitious defendants V-BB, whether singular or plural, are those entities which are the predecessors or successors-in-interest to any of those entities or individuals described above and herein.

## FACTUAL ALLEGATIONS

1. Defendants, named and fictitious, participated in a multi-decade conspiracy among the nation's dominant poultry processors including the defendant

processors. The purpose of this conspiracy was to eliminate competition for labor by artificially suppressing the compensation of hundreds of thousands of poultry workers, including the plaintiffs, to levels materially below what would have prevailed in a competitive market.

2. Agri Stats, Inc., is a foreign corporation that actively and directly solicited, serviced and maintained business services and systemically and regularly conducts or conducted business and provided their services in this jurisdiction, including the regular visits by Agri Stats representatives to co-conspirator defendant processing plants of defendant processors in this jurisdiction, and these business activities directly relate to the damages to the plaintiffs alleged in this action. Agri Stats established substantial ongoing contractual relationships involving physical presence in Alabama and engaged in continuing business relationships with the co-conspirator defendant processors which employed the plaintiffs and they knew or should have known these direct contacts would impact plaintiffs and those similarly situated.

3. Perdue Farms, Inc. and Perdue Foods LLC (collectively "Perdue") are integrated poultry processors with headquarters in Salisbury, Maryland. Perdue operates, or during the relevant time period operated poultry facilities across the United States including in this jurisdiction. Perdue is, or was, a central and long-standing participant in the conspiracy with co-Defendants to depress and fix wages of Plaintiffs.

4. Tyson is among the world's largest processors of chicken, beef, and pork, with headquarters in Springdale, Arkansas. Tyson operates poultry facilities throughout the United States including in this jurisdiction during the relevant time period. Tyson is, or was, a central and long-standing participant in the conspiracy with co-defendants to depress and fix wages of Plaintiffs.

5. Pilgrim's Pride Corporation ("Pilgrim's") is a major poultry processor headquartered in Greeley, Colorado. Pilgrim's operates poultry facilities across the United States including in Alabama. Pilgrim's is, or was, a core member of the conspiracy, actively participating in the annual meetings and using exchanged data from co-conspirator Agri Stats as a direct mechanism for setting and suppressing employee wages.

21

6. Sanderson Farms, Inc. ("Sanderson") is a poultry processor headquartered in Laurel, Mississippi. Sanderson Farms is, or was, a central and long-standing participant in the conspiracy with co-defendants to depress and fix wages of Plaintiffs.

7. Charoen Phopkhand Foods is a Thailand-based agro-industrial and food conglomerate and a co-conspirator with co-defendants to depress and fix wages of Plaintiffs. They operated poultry facilities across the United States including in this jurisdiction during the relevant time period. Additionally, in 2004, CP Foods sold its U.S. chicken-processing assets in Alabama. The integrated chicken business and substantial assets of Charoen Pokphand (USA) in Alabama were sold to Equity Group Eufaula Division, LLC.

8. Peco Foods Inc. is an Alabama based poultry processor headquartered in Tuscaloosa, Alabama. Peco Foods Inc. is, or was, a central and long-standing participant in the conspiracy with co-defendants to depress and fix wages of Plaintiffs.

9. Foster Poultry Farms, LLC poultry processor headquartered in Livingston, California. Foster Poultry Farms is, or was, a central and long-standing participant in the conspiracy with co-defendants to depress and fix wages of Plaintiffs.

10. Fictitious defendants A-G, whether singular or plural, is that person, firm, corporation or entity that was responsible for the defendants' payroll, human resources, accounting and decisions on the setting of employee wages and benefits.

11. Fictitious defendants H-N, whether singular or plural, is that person, firm, corporation or entity that managed, supervised and/or controlled the day-to-day business dealings of the defendant producers' facility at which the plaintiff(s) were employed during the time period relevant to the allegations in this action.

12. Fictitious defendants O-U, whether singular or plural, is that entity or those entities, that individual or those individuals, other than those described above, whose negligence, wantonness, intentional conduct, willfulness, fraud, conspiracy, complicity or other wrongful conduct contributed to the cause of the occurrence made the basis of Plaintiff's Complaint.

13. Fictitious defendants V-BB, whether singular or plural, are those entities which are the predecessors or successors-in-interest to any of those entities or individuals described above and herein.

14. The Individual HR and Plant Manager defendants are individuals whose identities are not yet fully known but who served as agents and employees of the defendant Processors. At all relevant times, these individuals acted within the line and scope of their employment. Their wrongful acts, including the direct exchange of competitively sensitive wage data with rival plants, were calculated to and did benefit their corporate employers by reducing labor costs. This conduct was known to, authorized by, and subsequently ratified by their respective employers.

15. All defendants, named and fictitious, participated in the same wage-fixing information exchange that directly suppressed wages paid to the plaintiffs causing damages.

16. All defendant producers, named and fictitious, subscribed to Agri Stats / WMS and attended meetings knowing Alabama plants and jobs were in the data set and that benchmark targets would be applied to Alabama wages causing damages to the plaintiffs and those similarly situated in this jurisdiction.

**A. The Poultry Processing Industry and its Susceptibility to Collusion**

1. The poultry processing industry possesses numerous structural characteristics, that make it uniquely susceptible to the type of long-running, collusive scheme alleged herein. These factors created an environment where the conspiracy could not only form but thrive for decades.

2. The defendant processors collectively control the majority of the U.S. poultry market. This high concentration limits the number of independent competitors, magnifies the conspirators' collective market power over labor, and simplifies the process of coordinating and policing a collusive agreement.

3. The cost of establishing a new, vertically integrated poultry processing complex, upon information and belief, exceeds $100 million. This immense capital requirement effectively prevents new competitors from entering the market to challenge the incumbents and disrupt their collusive arrangement.

4. Workers performing similar production and maintenance roles at different processing plants are largely interchangeable. This fungibility of labor makes it simple for competitors to compare and align compensation for any given position across the industry.

5. The workforce in poultry processing is disproportionately comprised of vulnerable populations, including marginalized citizens, immigrants, refugees, and asylum-seekers with limited English proficiency, education, and alternative employment options. This creates a captive labor pool that cannot easily respond to suppressed wages by seeking work elsewhere, allowing the defendants to depress compensation without fear of losing their workforce.

**B. The Decades-Long Conspiracy to Suppress Employee Compensation**

1. Upon information and belief, beginning as early as January 1, 2000, and continuing until at least July 20, 2021, the defendant Processors and their co-conspirators entered into a continuing contract, combination, and conspiracy to illegally fix, depress, maintain, and stabilize the compensation paid to their employees, including the plaintiffs, resulting in damage to plaintiffs.

2. The primary motivation for this conspiracy was to reduce labor costs—a substantial portion of each processor's operating expenses—and thereby maximize corporate profits at the direct expense of their employees. To facilitate this scheme, compensation decisions were centralized at the corporate headquarters of each defendant Processor rather than being made at the local plant level.

**C. The Mechanics of the Unlawful Conspiracy**

1. Defendant Producers did not passively receive WMS reports. Instead, competing processors formed a Poultry Industry Survey Group that collectively controlled the survey's scope, questions, participating companies, and the level of detail contained in results. A small Steering Committee of processor executives made the key decisions and met privately so that Defendants could speak candidly about compensation practices and align pay without oversight. WMS distributed survey results immediately before annual in-person compensation meetings, after which Defendants held private roundtables to coordinate how to apply the benchmarks to real-world pay decisions, including at Alabama plants.

24

2. The defendants executed their conspiracy through a sophisticated, multi-pronged strategy involving secretive in-person meetings, illicit information exchanges managed by third-party consultants, and direct communications between competitors.

3. A core component of the conspiracy was a series of annual in-person meetings of senior human resources and compensation executives from the competing defendant Processors.

4. These meetings were, upon information and belief, organized by a committee led by executives from defendants Tyson and Perdue, among others. Upon information and belief, these meetings were intentionally kept "off the books" to avoid creating a paper trail.

5. Upon information and belief these meetings, and the information shared, was/were to kept confidential.

6. During hours-long, private roundtable sessions executives from the defendants and others discussed survey results, agreed upon compensation rates for the coming year and chastised any processor that had deviated from previously fixed pay levels.

7. Webber, Meng, Sahl and Company, Inc. (WMS): WMS was hired to provide data to the producers under the guise of abiding by applicable regulations. WMS unwittingly provided the infrastructure for the conspiracy under a "veneer of legality." Its president, Jonathan Meng, repeatedly warned the defendant Processors that their practice of exchanging future, disaggregated compensation data violated the applicable laws. Despite these warnings, WMS, at the direction of the processors, designed surveys to collect this data, resulting in sham anonymization, and its representatives were excluded from private "roundtable sessions" where illicit and conspiratorial agreements were being made.

8. The survey's framework was used as a pretext to hide Defendants' conspiracy from employees and the public. By routing their wage exchanges through WMS while dictating unlawful levels of detail and future-looking content, Defendants concealed material facts: that they were no longer competing for labor in Alabama and were instead jointly suppressing compensation. This concealment and

coordinated conduct form part of the fraudulent scheme, civil conspiracy, and unjust enrichment described in this Complaint.

### 2. Illicit Information Exchanges Facilitated by Agri Stats

1. **Webber, Meng, Sahl & Co. (WMS)** was hired to administer an annual "Poultry Industry Compensation Survey," providing a veil of legality to the information exchange.

   a. The survey was designed by the processors' Steering Committee to collect detailed data on wages, salaries, and benefits. Crucially, against the repeated warnings of WMS President Jonathan Meng the survey collected future compensation data, including planned salary increases and their timing.

   b. Mr. Meng ultimately concluded that the processors hired WMS to "create an appearance of compliance" while they "continued to exchange disaggregated and deanonymized compensation data and continued to discuss and harmonize their compensation practices."

2. The survey employed an anonymization technique, replacing company names with letter codes. However, the reports contained such granular detail (e.g., plant locations, employee counts) that participants, Defendants, could easily identify their specific competitors. A former Perdue employee confirmed this, stating it was easy when "you're sitting in a meeting and the person across from you [from a competing processor] is reporting on what they do."

3. **Agri Stats, Inc.** provided the mechanism for continuous monitoring and enforcement of the conspiracy.

   a. Agri Stats collected and distributed monthly reports containing terabytes of detailed, current, non-public, and plant-specific compensation data from over 95% of U.S. poultry processors.

   b. Agri Stats collected non-public, confidential, and proprietary wage and compensation data from competing poultry processors and redistributed that data among the processors on a monthly basis, including current hourly wages and salaries broken down by plant and job position. This data was not publicly available and could only be accessed by processors that

reciprocated by submitting their own detailed compensation information, thereby enabling coordinated wage decision-making among competitors.

c.  Agri Stats falsely represented that its compensation reports were anonymized or aggregated, while knowingly distributing highly granular, disaggregated data that processors could and did reverse-engineer to identify which competitors and which specific plants corresponded to particular wage figures. This sham anonymization concealed the true nature of the inter-company wage exchange while allowing processors to coordinate compensation with precision.

d.  Despite claims of anonymity, the data was easily decodable. A former Perdue employee stated the anonymity claim was "just bullshit" and that every participating processor "knew precisely which company reported which data."

e.  The monthly frequency of the reports allowed defendants to ensure no co-conspirator broke ranks by raising wages. A former Butterball executive confirmed there was "no question about it" that Agri Stats was used by processors to "monitor each other's performance." The crucial role of this data is underscored by the public statement of Joe Sanderson, then-CEO of Sanderson Farms, that "we live and die by Agri Stats."

f.  Agri Stats travelled between each Defendant Processor regularly and discussed the nonpublic, proprietary data at those meetings, including but not limited to quarterly in-person meetings with each processor's executives, involving travel between producers and discussion of non-public data.

g.  Agri Stats representatives physically visited each co-conspirator defendant processor plant, conducting on-site meetings lasting at least one week to establish data-collection processes, identify internal payroll data sources, and standardize reporting formats. These visits embedded Agri Stats directly inside processor operations and facilitated the ongoing exchange of sensitive wage information.

27

h. Agri Stats employees and representatives assisted poultry processors in interpreting and decoding Agri Stats reports, including by explaining how to determine which competitor submitted specific compensation data. Agri Stats personnel trained processor management on how to extract competitive intelligence from the reports, further enabling coordinated wage suppression.

i. Agri Stats audited the raw wage data submitted by processors to ensure accuracy and consistency, which ensured that no processor could deviate from agreed-upon compensation levels by secretly paying higher wages. These audits functioned as a policing and enforcement mechanism, reinforcing adherence to coordinated wage suppression.

j. Through the monthly dissemination of current wage data, Agri Stats enabled co-conspirator defendant processors to continuously monitor each other's compensation levels and detect deviations in near real time. This continuous monitoring reduced competitive uncertainty and stabilized wages across processors.

k. Agri Stats data was reviewed at individual poultry processing plants, not merely at corporate headquarters. Corporate officers and plant managers used Agri Stats benchmarks to compare plant wages against competitors and ensure that wages remained within coordinated ranges. Agri State corporate personnel were tasked with visiting plants to ensure wages stayed precisely aligned with Agri Stats benchmarks.

l. Agri Stats' reports were not sold to the public, employees, or unions. Agri Stats concealed the existence and mechanics of coordinated wage suppression from workers.

m. Because Agri Stats regularly travelled between processors, discussed proprietary wage data with each, and audited their submissions, it acted as a central hub connecting competing employers and transmitting information that allowed the conspiracy to function, persist, and remain concealed.

n. Each of the foregoing acts was intentional, knowing, and undertaken in furtherance of a common scheme to suppress and stabilize wages. Agri

28

Stats knew that the compensation data it collected, analyzed, audited, and redistributed would be used by competing poultry processors to coordinate wage decisions, and Agri Stats substantially assisted that scheme through repeated, affirmative conduct resulting in harm to plaintiffs.

### 3. Direct Plant-to-Plant Communications

1. The conspiracy was furthered by frequent, direct communications between managers at competing plants. Plant managers and human resources personnel regularly contacted their counterparts at nearby rival facilities to request and exchange current and future wage and benefit information.

2. A former human resources manager who worked for both Perdue and George's admitted to this practice, stating, "We would collaborate. We would talk among each other to see what they were doing for pay."

### D. Fraudulent Concealment of the Conspiracy

1. The defendants took active and deliberate steps to fraudulently conceal their unlawful conduct from their employees and the public. These steps included:

    a. Holding secret, "off the books" meetings and requiring in-person attendance to avoid a paper trail.

    b. Using third-party consultants and sham data anonymization techniques to create a facade of legality for their illicit information exchanges.

    c. Making false and misleading public statements on company websites and in advertisements claiming they paid "competitive wages," all while actively conspiring to suppress those same wages.

2. Following increased scrutiny, including the filing of a separate price-fixing lawsuit in 2016, several defendant Processors abruptly withdrew from the WMS survey, citing the "advice of legal counsel." This change in behavior is compelling evidence of the defendants' consciousness of guilt.

### E. Harm to the Plaintiffs

1. The direct and intended result of the defendants' conspiracy was the artificial suppression of worker compensation. While worker productivity skyrocketed

with processing line speeds increasing by **54%** between 1999 and 2015 the real-world earnings of those workers plummeted. During that same period, inflation-adjusted hourly wages for poultry processing workers *decreased* by more than **1%**.

2.  The small annual raises that workers did receive were often entirely offset by corresponding increases in health insurance premiums. As a direct result of the conspiracy, the plaintiffs and other similarly situated workers were paid materially less than they would have been in a competitive market, which systematically transferred wealth from the plaintiffs and the class to the defendants in the form of artificially inflated corporate profits.

**F. Specific Allegations Against Each Defendant**

1.  **The Perdue Defendants:** Perdue was a central and long-standing participant in the conspiracy. Its employees attended every annual compensation meeting between 2001 and 2019, submitted detailed compensation data to WMS every year from 2000 to 2019, and subscribed to Agri Stats. A former Perdue employee described the company's CEO as an "Agri Stats guru" and stated that Perdue managers regularly collaborated with rivals to exchange wage information.

2.  Perdue employees knew that compensation data submitted through WMS was readily attributable to specific companies and plants, particularly during in-person meetings where competitors discussed their own reported data. A former Perdue employee explained that the source of compensation figures was obvious because "you're sitting in a meeting and the person across from you is reporting on what they do."

3.  Upon information and belief, Perdue used the Agri-Stats data to incorporate and monitor the conspiracy to suppress wages and ensure compliance by all defendants with the conspiracy.

4.  Perdue subscribed to Agri Stats to exchange current, disaggregated, readily decodable, and plant-specific compensation data with competing poultry processors including co-conspirator defendants on a monthly basis.

5.  Perdue regularly attended the annual meetings of co-conspirator defendants and obtained and exchanged competing processors information regarding wages, agreed to the conspiracy to suppress wages at artificially depressed levels.

30

6. Perdue submitted data to the annual WMS survey during multiple years and subscribed to Agri Stats to exchange plant-specific compensation data on a monthly basis.

7. Perdue regularly exchanged current and future wages with managers from co-conspirator defendants and any planned future wage increases.

8. Perdue brought Agri Stats personnel into the company to train management on how to extract and interpret competitor-specific wage information from Agri Stats reports, despite the nominal claim that the data was anonymous.

9. Perdue employees reviewed disaggregated Agri Stats wage data during meetings held at Perdue poultry processing plants, using competitor comparisons to guide wage decisions at individual facilities rather than responding to local labor market forces.

10. Perdue and other co-conspirator defendants continued to reveal and discuss their specific compensation practices, future compensation plans, and target wage levels "behind closed doors", even after being warned that such conduct was inconsistent with lawful compensation benchmarking.

11. Perdue's knowing participation in repeated data exchanges, secret meetings, and direct communications predictably suppressed wages and benefits paid to poultry processing workers, transferring economic value from workers to Perdue in the form of reduced labor costs and increased profits.

12. Each of the foregoing acts was intentional, knowing, and undertaken in concert with other co-conspirator defendants pursuant to a common plan to suppress employee compensation. Perdue knowingly joined and materially advanced a coordinated scheme that foreseeably caused economic harm to poultry workers, including Plaintiffs, and unjustly enriched Perdue at the expense of plaintiffs and those similarly situated.

13. **The Tyson Defendants:** Tyson was a leader of the conspiracy, serving on the Steering Committee that directed the WMS surveys. A Tyson Vice President of Compensation admitted in a 2015 email that "hourly production projected budgets" were "typically a discussion item" at the secret meetings. From 2013 to 2015, Tyson single-handedly paid WMS to conduct an even more granular survey

31

to facilitate the exchange of raw, plant-level data, despite WMS's warnings that this violated the applicable law.

14. Tyson subscribed to Agri Stats and used it to exchange current, disaggregated, readily decodable, plant-specific compensation data with competing poultry processors on a monthly basis.

15. Tyson relied on Agri Stats reports to compare its wages to competitors and to keep its compensation within coordinated ranges rather than responding independently to labor market conditions.

16. Tyson employees and executives regularly attended secret, off-the-books Poultry Industry Compensation Committee meetings, including meetings held at the Hilton Sandestin Resort in Destin, Florida, where competing poultry processors exchanged non-public compensation information and discussed wages and benefits. These meetings were intentionally conducted outside normal reporting channels and without transparency to employees, and they facilitated coordinated wage decisions rather than independent competition.

17. Tyson was represented on the Steering Committee that controlled the structure, scope, and content of the WMS poultry compensation surveys for most of the relevant period. Through this role, Tyson participated in decisions to expand the surveys beyond generalized averages and to require more granular, plant-level, and job-specific compensation information, increasing the usefulness of the surveys for coordinating wages rather than benchmarking competitively.

18. Tyson initiated, designed, and funded a supplemental compensation survey that collected raw, disaggregated, plant-level wage data for production, maintenance, and refrigeration workers. Tyson requested this survey despite warnings that its format violated accepted safeguards and facilitated identification of individual companies' and plants' wage data. Tyson paid for the survey, dictated its structure, and caused its results to be distributed to participating processors.

19. Tyson employees recruited other poultry processors to participate in the Tyson-sponsored survey and encouraged their submission of detailed wage data. Participants proceeded despite express warnings that the survey format defeated anonymity and allowed compensation data to be traced back to specific companies and plants.

20. Tyson regularly attended the annual meetings of co-conspirator defendants and obtained and exchanged competing processors information regarding wages, agreed to the conspiracy to suppress wages at artificially depressed levels.

21. In advance of and for use at these secret compensation meetings, Tyson employees submitted highly detailed current and future compensation data to WMS, knowing and intending that the data would be distributed to, reviewed by, and discussed among competing poultry processors. Tyson made these submissions repeatedly over multiple years as part of the same coordinated scheme.

22. Tyson submitted data to the annual WMS survey during multiple years and subscribed to Agri Stats to exchange plant-specific compensation data on a monthly basis.

23. Tyson submitted highly detailed current compensation data to WMS in advance of meetings, knowing/expecting it would be distributed to and examined by competitors including co-conspirator defendants.

24. Tyson regularly exchanged current and future wages with managers from co-conspirator defendants and any planned future wage increases.

25. Tyson set compensation schedules and paid workers at "artificially depressed, wage fixed rates

26. Tyson employees directly communicated with human-resources managers at competing poultry plants, including co-conspirator defendants to exchange current and future wage rates, including planned increases. These bilateral exchanges further reduced competition for labor and reinforced coordinated wage suppression.

27. As a result of this conduct, Tyson established compensation schedules and paid poultry workers' wages and benefits that were artificially suppressed and stabilized, rather than competitively determined. Tyson retained the financial benefit of reduced labor costs while workers bore the harm of depressed compensation resulting in damages to plaintiffs.

28. **Pilgrim's Pride Corporation:** Pilgrim's Pride was a core member of the conspiracy. A former employee stated that the company explicitly used Agri Stats data to set wages with the goal of paying "exactly in the middle" of the reported industry

average. Its executives also requested that plant managers obtain current and future compensation information directly from competitors.

29. Pilgrim's subscribed to Agri Stats to exchange current, disaggregated, readily decodable, and plant-specific compensation data with competing poultry processors on a monthly basis.

30. Pilgrim's regularly attended the annual meetings of co-conspirator defendants and obtained and exchanged competing processors information regarding wages, agreed to the conspiracy to suppress wages at artificially depressed levels. In 2017, Pilgrim's withdrew from the annual meeting on the advice of counsel, demonstrating consciousness of its illegal conduct. However, they resumed participation in these meetings in 2018 and 2019.

31. Pilgrim's employees submitted detailed compensation data to WIMS for inclusion in the annual Poultry Industry Compensation Surveys. Pilgrim's knew and intended that this data, including current wages and planned future increases, would be distributed to and reviewed by competing processors during compensation meetings and related discussions.

32. Pilgrim's was among the co-conspirator defendants that controlled and influenced the design and operation of the WMS surveys, including decisions to collect granular, plant-level and job-specific compensation data. Pilgrim's participated in surveys structured in a manner that allowed competitors, including co-conspirator defendants, to identify and compare each other's compensation practices.

33. Pilgrim's regularly exchanged current and future wages with managers from co-conspirator defendants and any planned future wage increases.

34. Pilgrim's used Agri Stats data at both corporate and plant levels, reviewing competitor compensation benchmarks to ensure that wages paid at individual Pilgrim's facilities remained aligned with industry benchmarks. Corporate personnel reviewed Agri Stats data with plant management to guide wage decisions.

35. In addition to survey-based exchanges, Pilgrim's Pride employees directly exchanged current and future wage information with employees of competing poultry processors. For example, Pilgrim's personnel exchanged wage information

with Tyson employees regarding planned wage rates at specific plants, reducing uncertainty and reinforcing coordinated wage practices.

36. According to WMS President Jonathan Meng, Pilgrim's and other processors continued to discuss specific compensation practices, future wage plans, and target pay levels "behind closed doors", even after warnings that such exchanges were inconsistent with lawful benchmarking practices. Pilgrim's nevertheless continued participating in the surveys and meetings.

37. Pilgrim's established compensation schedules using survey results and Agri Stats benchmarks to align wages across its poultry processing facilities, rather than allowing wages to be determined by local labor supply and demand.

38. Through its participation in repeated data exchanges, secret meetings, and direct communications, Pilgrim's paid poultry processing workers, including the plaintiffs, wages and benefits that were suppressed and stabilized, transferring economic value from workers to Pilgrim's in the form of reduced labor costs.

39. Pilgrim's operated poultry processing facilities employing workers in Alabama and implemented compensation practices at those Alabama facilities that were informed by and aligned with the coordinated benchmarks and exchanges described above. These acts were directed at and caused harm to Alabama workers, including Plaintiffs.

40. Each of the foregoing acts was intentional, knowing, and undertaken in concert with others. Pilgrim's knowingly participated in a coordinated course of conduct that foreseeably suppressed employee compensation and unjustly enriched Pilgrim's at the expense of poultry processing workers, including Plaintiffs.

41. **Sanderson Farms, Inc.:** Sanderson subscribed to Agri Stats to exchange current, disaggregated, readily decodable, and plant-specific compensation data with competing poultry processors on a monthly basis.

42. Sanderson employees submitted detailed compensation data to WMS for use in the annual Poultry Industry Compensation Survey, with the understanding that the data would be shared with and reviewed by competing processors at the compensation meetings including co-conspirator defendant processors. This

35

included current wage information used to benchmark and align compensation across companies.

43. Sanderson Farms participated in surveys that were structured to allow competitors, including co-conspirator defendant processors, to identify the source of compensation data, including through granular plant-level details. Survey participants, including Sanderson Farms, reviewed compensation information in formats that allowed executives to match wage figures to specific competing companies and facilities including co-conspirator defendant processors.

44. Sanderson regularly attended the annual meetings of co-conspirator defendants and obtained and exchanged competing processors information regarding wages, agreed to the conspiracy to suppress wages at artificially depressed levels.

45. Sanderson Farms was deeply integrated into the conspiracy, with its then-CEO publicly stating, "we live and die by Agri Stats." Like other conspirators, Sanderson Farms attended the secret annual meetings before withdrawing from the WMS survey group in 2012, informing other members that it was doing so "On the advice of legal counsel."

46. Following Sanderson Farms' merger with Wayne Farms, the resulting Wayne-Sanderson entity continued poultry processing operations using compensation structures informed by industry benchmarking practices, including Agri Stats data, thereby perpetuating the effects of the coordinated wage-setting scheme.

47. Through the foregoing conduct, Sanderson Farms paid poultry processing workers, including plaintiffs, wages that were suppressed and stabilized, transferring economic value from workers to Sanderson in the form of reduced labor costs and increased profitability.

48. Each of the foregoing acts was intentional, coordinated, and undertaken in concert with others. Sanderson Farms knowingly participated in a shared course of conduct that predictably suppressed employee compensation and unjustly benefited Sanderson at the expense of poultry processing workers, including Plaintiffs.

49. **Agri Stats, Inc.:** Agri Stats was the central monitoring and enforcement arm of the conspiracy as previously stated herein. It collected and distributed detailed, non-

public, and readily decodable compensation data on a monthly basis. A former Perdue employee stated Agri Stats was responsible for "collusion in the poultry industry," and by admission of a former producer, confirmed that Agri Stats was used to monitor each other's performance. Agri Stats profited handsomely from its role, charging each processor substantial fees.

50. **Cargill Meat Solutions:** Cargill employees attended regular annual meetings, and every annual meeting between 2001 and 2019 where executives from competing poultry processors gathered to exchange information about, discuss, agree upon, and fix the wages, salaries, and benefits of the plaintiffs and those similarly situated at artificially depressed levels.

51. Cargill submitted data to the annual WMS survey during multiple years and subscribed to Agri Stats to exchange plant-specific compensation data on a monthly basis.

52. Cargill exchanged current and future wages with managers of co-conspirator defendants and any planned future wage increases.

53. Cargill and other processors, including co-conspirator defendants, continued to reveal and discuss specific compensation practices, future wage plans, and target pay levels behind closed doors, even after being warned that such exchanges posed legal risks and were inconsistent with lawful benchmarking safeguards.

54. Through the foregoing conduct, Sanderson Farms paid poultry processing workers, including plaintiffs, wages that were suppressed and stabilized, transferring economic value from workers to Sanderson in the form of reduced labor costs and increased profitability.

55. Cargill operated poultry processing facilities and related operations employing workers in Alabama and implemented compensation practices at those Alabama facilities that were informed by and aligned with the coordinated benchmarks and exchanges described above. These acts were directed at and caused harm to Alabama workers, including Plaintiffs.

56. Each of the foregoing acts was intentional, knowing, and undertaken in concert with others. Cargill knowingly joined and materially advanced a coordinated

scheme that foreseeably suppressed employee compensation and unjustly enriched Cargill at the expense of poultry processing workers, including Plaintiffs.

57. **Fictitious Defendants A-BB:** The individual John and Jane Doe defendants, including but not limited to HR and Plant Managers, successors, were the agents who carried out the conspiracy on the ground. Acting within the scope of their employment and at the direction of their corporate superiors, they engaged in regular bilateral exchanges of current and future wage information with managers at rival plants. These acts directly furthered the conspiracy and benefited their employers by ensuring local pay rates remained aligned and suppressed.

58. The foregoing factual allegations give rise to the following legal claims for relief.

## CAUSES OF ACTION
### COUNT I: FRAUD & FRAUDULENT CONCEALMENT (Against All defendants)

1. Plaintiffs reallege and incorporate by reference all preceding paragraphs as if fully set forth herein.

2. Under Alabama law, a claim for fraudulent concealment is established by showing (1) a duty on the part of the defendant to disclose a material fact; (2) concealment or nondisclosure of that fact; (3) inducement of the plaintiff to act; and (4) action by the plaintiff to his or her injury. *Chiepalich v. Chiepalich*, 392 So. 3d 467 (Ala. 2023); APJI 16.05.

3. Defendants had a duty to disclose to their employees, the plaintiffs, the existence of a conspiracy to artificially fix and suppress their wages. This duty arose from the particular circumstances of the employment relationship and the defendants' superior knowledge of the scheme.

4. Defendants actively and intentionally concealed this material fact by holding off the book meetings, using sham data anonymization to create a facade of legality, and making false public statements about offering competitive wages.

5. Defendants suppressed the existence of their inter-company wage-coordination scheme, a material fact plaintiffs could not reasonably discover, and that would have changed their employment and bargaining decisions

6. This fraudulent concealment induced the plaintiffs to continue their employment with the defendant Processors under the false belief that their compensation was determined by legitimate market forces.

7. As a direct and proximate result of this concealment, Plaintiffs continued to provide their labor for artificially depressed compensation, thereby suffering actual economic damage in the form of lost wages and benefits.

## COUNT II: UNJUST ENRICHMENT (Against Defendant Employer Processors)

1. Plaintiffs reallege and incorporate by reference all preceding paragraphs as if fully set forth herein.

2. The plaintiffs provided something of value to the defendants, their labor;

3. The defendants requested Plaintiffs' labor efforts;

4. The plaintiffs are entitled by law to fair compensation; and

5. Fair compensation is necessary to prevent the defendants from being unjustly enriched. APJI 11.18; *Matador Holdings, Inc. v. HoPo Realty Investments, L.L.C.*, 77 So. 3d 139 (Ala. 2011).

6. The plaintiffs provided a benefit to the defendant Processors in the form of their labor. The defendant Processors knowingly accepted and retained this benefit.

7. Processors retained the benefit of unlawfully reduced labor costs in this jurisdiction.

8. The retention of this benefit is unjust because it was obtained through "unconscionable conduct," namely the fraudulent, coercive, and long-running conspiracy to illegally suppress employee wages. *Jordan v. Mitchell*, 705 So. 2d 453 (Ala. Civ. App. 1997). The defendant Processors have been unjustly enriched by the value of the labor for which they systematically and illegally underpaid the plaintiffs.

## COUNT III: NEGLIGENCE (Against All Defendants)

1. Plaintiffs reallege and incorporate by reference all preceding paragraphs as if fully set forth herein.

2. Defendants owed a duty of reasonable care to their employees and to the labor market to not engage in conduct that would unlawfully restrain trade and artificially suppress wages and cause damages to the plaintiffs and those similarly situated in this jurisdiction.

3. Defendants breached this duty by forming, implementing, monitoring, and concealing a conspiracy that systematically dismantled the competitive mechanisms for wage-setting in the poultry processing industry and caused damages to the plaintiffs and those similarly situated in this jurisdiction.

4. This breach was the direct and proximate cause of the plaintiffs' harm, as it resulted in their compensation being set at artificially depressed levels, causing significant economic damages.

### COUNT IV: WANTONNESS (Against All Defendants)

1. Plaintiffs reallege and incorporate by reference all preceding paragraphs as if fully set forth herein.

2. Wantonness is conduct carried on with a reckless or conscious disregard of the rights or safety of others, with an awareness that harm will likely result. *APJI 9.00; Ala. Code § 6-11-20(b)(3).*

3. The defendants' participated in a multi-decade, systematic, and fraudulently concealed conspiracy to suppress the wages of a vulnerable workforce for the purpose of maximizing corporate profit with a conscious and reckless disregard for the rights of the plaintiffs.

4. Defendants knew or should have known that their actions in eliminating labor market competition would probably and likely result in substantial economic harm to their employees and cause damages to the plaintiffs and those similarly situated in this jurisdiction. Their decision to proceed with this scheme for over twenty years constitutes wantonness and directly and proximately caused damages to plaintiffs.

### COUNT V: CIVIL CONSPIRACY (Against All Defendants)

1. Plaintiffs reallege and incorporate by reference all preceding paragraphs as if fully set forth herein.

2. A civil conspiracy is a combination of two or more persons to do something unlawful or to do something lawful by unlawful means. The underlying torts for this conspiracy include, but are not limited to, fraud, fraudulent concealment, and wantonness, which are sufficient to support a conspiracy claim under Alabama law.

3. As detailed in the Factual Allegations, all defendants agreed and worked together to achieve a common, unlawful end: the suppression of employee compensation, to the detriment of the plaintiffs causing damages to the plaintiffs and those similarly situated in this jurisdiction.

4. Defendants achieved this end through unlawful means, including secret meetings, fraudulent information exchanges, and other tortious acts as outlined herein. This concerted action directly and proximately caused the plaintiffs' economic and emotional harm.

## COUNT VI: OUTRAGE (INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS) (Against All Defendants)

1. Plaintiffs reallege and incorporate by reference all preceding paragraphs as if fully set forth herein.

2. Defendants' conduct, a multi-decade, secret scheme to exploit a captive and vulnerable workforce for corporate profit by illegally suppressing their wage, is so outrageous in character and so extreme in degree that it goes beyond all bounds of decency, and it is regarded as atrocious and utterly intolerable in a civilized society.

3. This intentional and extreme conduct caused the plaintiffs severe emotional distress, including feelings of anxiety, hopelessness, and betrayal, resulting from the knowledge that their hard labor was systematically undervalued through an illegal and fraudulent scheme.

4. The defendants intended to cause, or knew their conduct was likely to cause, emotional distress of Plaintiffs and those similarly situated in this jurisdiction;

5. The defendants' conduct was extreme and outrageous;

6. The defendants' conduct caused emotional distress; and

41

7. The distress to Plaintiffs was severe.

## COUNT VII: INTENTIONAL INTERFERENCE WITH A BUSINESS RELATIONSHIP (Non-employer co-conspirators)

1. Plaintiffs reallege and incorporate by reference all preceding paragraphs as if fully set forth herein.

2. Each Plaintiff had a protectible business relationship with their respective employer (one of the defendant Processors).

3. Employment relationships existed between each Plaintiff and their direct employer.

4. The co-conspirator defendants intentionally interfered with these relationships by engaging in a conspiracy to fix wages at artificially low levels, thereby altering a fundamental term of the employment relationship to the plaintiffs' detriment.

5. The co-conspirator defendants knew or should have known that their actions would cause damages to workers in this jurisdiction, including the plaintiffs and those similarly situated.

6. This intentional interference directly and proximately damaged the plaintiffs by causing them to receive suppressed compensation.

## COUNT VIII: VICARIOUS LIABILITY & RATIFICATION (Against Defendant Processors)

1. Plaintiffs reallege and incorporate by reference all preceding paragraphs as if fully set forth herein.

2. Pursuant to APJI 5.00, 5.08, 9.03, and Ala. Code § 6-11-27, the Defendant Processors are vicariously liable for the wrongful acts of their agents and employees, including the individual HR and Plant Manager Defendants.

3. These employees acted within the line and scope of their employment when they participated in the conspiracy, as their acts of exchanging wage data were part of their job responsibilities and were calculated to benefit their employers by lowering labor costs.

4. The defendant Processors, with full knowledge of the facts and circumstances of this conduct, ratified the wrongful acts of their employees by accepting the benefits of suppressed labor costs and continuing the conspiracy for over two decades which directly and proximately caused damages to the plaintiffs.

## PRAYER FOR RELIEF

**WHEREFORE, PREMISES CONSIDERED,** Plaintiffs respectfully request that this Honorable Court enter a judgment in their favor and against the defendants, jointly and severally, and award the following relief:

1. A judgment in favor of the plaintiffs and against the defendants, not to exceed $74,999.00 per Plaintiff;

2. An award of compensatory damages in an amount to be determined at trial for lost wages, salaries, and benefits;

3. An award of damages for mental anguish and emotional distress in an amount to be determined at trial;

4. An award of punitive damages in an amount sufficient to punish the defendants for their fraudulent, wanton, and malicious conduct and to deter similar conduct in the future;

5. An award of pre-judgment and post-judgment interest as allowed by law;

6. An award for the costs of this action and reasonable attorneys' fees; and

7. Such other and further relief as the Court deems just, equitable, and proper.

*/s/ Christina D. Crow*
One of the attorneys for Plaintiffs

OF COUNSEL:
Christina D. Crow (CRO064)
C. Elizabeth Littell (LIT028)
Kijana Mitchell (MIT080)
JINKS CROW, PC
219 N. Prairie Street
Union Springs, AL 36089
334-738-4225

christy.crow@jinkscrow.com
lisa.littell@jinkscrow.com
kijana.mitchell@jinkscrow.com

## JURY DEMAND

Plaintiffs demand a trial by jury on all issues so triable.

*/s/ Christina D. Crow*
OF COUNSEL

**Service on Defendants as follows:**

Agri Stats, Inc.
c/o Brenda Sievers
6510 Mutual Dr
Fort Wayne, IN 46825

Perdue Farms, Inc.
c/o CT Corporation System
2 N Jackson Street, Suite 605
Montgomery, AL 36104

Perdue Foods LLC
c/o CT Corporation System
2 N Jackson Street, Suite 605
Montgomery, AL 36104

Tyson Foods, Inc.
c/o United Agent Group Inc.
1521 Concord Pike, Suite 201
Wilmington, DE 19803

Pilgrim's Pride Corporation
c/o CT Corporation System
2 North Jackson St, Suite 605
Montgomery, AL 36104

44

Wayne-Sanderson Farms LLC
c/o CT Corporation System
2 N Jackson Street, Suite 605
Montgomery, AL 36104

Wayne Farms, LLC
c/o CT Corporation System
2 N Jackson Street, Suite 605
Montgomery, AL 36104

Cargill Meat Solutions, Inc.
c/o United Agent Group Inc.
4000 Eagle Point Corporate Dr
Birmingham, AL 35242

Continental Grain Company
c/o CT Corporation System
2 N Jackson Street, Suite 605
Montgomery, AL 36104

Peco Foods Inc.
c/o Patrick Noland
1101 Greensboro Ave
Tuscaloosa, AL 35401

Foster Poultry Farms, LLC
c/o CT Corporation System
2 North Jackson St., Suite 605
Montgomery, AL 36104

**Wolters Kluwer**

**CT Corporation**
**Service of Process Notification**
12/30/2025
CT Log Number 550988945

## Service of Process Transmittal Summary

| | |
|---|---|
| **TO:** | Dana Sharitt<br>Wayne Farms LLC<br>4110 CONTINENTAL DR<br>OAKWOOD, GA 30566-2800 |
| **RE:** | **Process Served in Alabama** |
| **FOR:** | Wayne-Sanderson Farms LLC  (Domestic State: DE) |

**ENCLOSED ARE COPIES OF LEGAL PROCESS RECEIVED BY THE STATUTORY AGENT OF THE ABOVE COMPANY AS FOLLOWS:**

| | |
|---|---|
| **TITLE OF ACTION:** | ALEXIS BIANCA ADAMS; CHRISTAL DENISE ANGLIN; CHRISTOPHER LEMONT ANGLIN; JAMES ELBERT ANGLIN JR; DEVAN TAMAR BAXTE; BRUCE CODERRICK BAXTER; DENISE BLACKMON; ARTHUR LEE BLAKELY, JR.; JAMES BOSWELL, JR.; BETTY JO BOYKIN; EZEKEL BOYKIN; ALFREDA M BURKS; BETTY ANN BURKS; BRUCE BURKS; ANDREW CAREY; DORIS M. CAREY; DANNY LEE CHAMBERS; ISOM RAKEEM DAFFIN; BOBBY DANIELS; CAROLYN WHIGHAM DANIELS; CORDARYLL DYSHAWN DANIELS; FREDERICK DANIELS; JACQUELINE S. DAVIS; JASMINE RAYDEN DAVIS; CHERRY ANN DEVOSE vs. AGRI STATS, INC. |
| **CASE #:** | 06CV202590004800 |
| **PROCESS SERVED ON:** | C T Corporation System, Montgomery, AL |
| **DATE/METHOD OF SERVICE:** | By Traceable Mail on 12/30/2025 |
| **JURISDICTION SERVED:** | Alabama |
| **ACTION ITEMS:** | SOP Papers with Transmittal, via  UPS Next Day Air |
| | Image SOP |
| | Email Notification,  Dana Sharitt  dana.sharitt@waynesanderson.com |
| | Email Notification,  Mason Wood  mason.wood@waynesanderson.com |
| | Email Notification,  Zachary Grant  zachary.grant@waynesanderson.com |
| | Email Notification,  Debbie Herring  debbie.herring@waynesanderson.com |
| | Email Notification,  Judith Carswell  judith.carswell@waynesanderson.com |
| | Email Notification,  Madison Baker  madison.baker@waynesanderson.com |
| | Email Notification,  Tracy Moss  tracy.moss@waynesanderson.com |
| | Email Notification,  Toni Bynum  toni.bynum@waynesanderson.com |
| **REGISTERED AGENT CONTACT:** | C T Corporation System<br>2 North Jackson Street<br>Suite 605<br>Montgomery, AL 36104<br>866-401-8252<br>LargeCorporationTeam@wolterskluwer.com |

The information contained in this Transmittal is provided by CT for quick reference only. It does not constitute a legal opinion, and should not otherwise be relied on, as to the nature of action, the amount of damages, the answer date, or any other information contained in the included documents. The recipient(s) of this form is responsible for reviewing and interpreting the included documents and taking appropriate action, including consulting with its legal and other advisors as necessary. CT



**CT Corporation**
**Service of Process Notification**
12/30/2025
CT Log Number 550988945

disclaims all liability for the information contained in this form, including for any omissions or inaccuracies that may be contained therein.



FOLD HERE

DOCUMENT 3

# View/Print Label

1 Print the label: Select Print from the File menu in this browser window to print the label below.

2 **Fold the printed label at the dotted line.** Place the label in a UPS Shipping Pouch. If you do not have a pouch, affix the folded label using clear plastic shipping tape over the entire label.

3 **GETTING YOUR SHIPMENT TO UPS**

o Air shipments (including Worldwide Express and Expedited) can be picked up or dropped off. To schedule a pickup, or to find a drop-off location, select the Pickup or Drop-off icon from the UPS tool bar.

o Take this package to any location of The UPS Store®, UPS Drop Box, UPS Customer Center, UPS Alliances (Office Depot® or Staples®) or Authorized Shipping Outlet near you or visit www.ups.com/content/us/en/index.jsx and select Drop Off.

# IN THE CIRCUIT COURT OF BARBOUR COUNTY, ALABAMA
## CIVIL ACTION NO. 06-CV-2025-900048.00

**ALEXIS BIANCA ADAMS, Plaintiff**

v.

**WAYNE-SANDERSON FARMS LLC, Defendant**

## SUMMONS

This service by commercial carrier of this summons is initiated upon the written request of Plaintiff's attorney pursuant to the Alabama Rules of Civil Procedure.

NOTICE TO  WAYNE-SANDERSON FARMS LLC, C/O CT CORPORATION SYSTEM 2

The Complaint which is attached to this summons is important and you must take immediate action to protect your rights. You are required to mail or hand deliver a copy of a written Answer, either admitting or denying each allegation in the Complaint, to Carolyn Elizabeth Littell, the lawyer for the Plaintiff(s), whose address is:

PO Box 350, Union Springs, AL 36089

THIS ANSWER MUST BE MAILED OR DELIVERED WITHIN THIRTY (30) DAYS FROM THE DATE OF DELIVERY OF THIS SUMMONS AND COMPLAINT AS EVIDENCED BY THE RETURN RECEIPT, OR A JUDGMENT BY DEFAULT MAY BE ENTERED AGAINST YOU FOR THE MONEY OR OTHER THINGS DEMANDED IN THE COMPLAINT. You must also file the original of your Answer with the Clerk of this Court within a reasonable time afterward.

/s/ PAIGE SMITH

Clerk of Court

Dated: 12/15/2025

DOCUMENT

ELECTRONICALLY FILED
12/15/2025 1:00 PM
06-CV-2025-900048.00
CIRCUIT COURT OF
BARBOUR COUNTY, ALABAMA
PAIGE SMITH, CLERK

| State of Alabama | **COVER SHEET** | |
|---|---|---|
| Unified Judicial System | **CIRCUIT COURT - CIVIL CASE** | Ca: 0€ |
| Form ARCiv-93   Rev. 9/25 | (Not For Domestic Relations Cases) | Date of Filing:        Judge Code: |
| | | 12/15/2025 |

## GENERAL INFORMATION

### IN THE CIRCUIT COURT OF BARBOUR COUNTY, ALABAMA
### ALEXIS BIANCA ADAMS ET AL v. AGRI STATS, INC. ET AL

First Plaintiff: ☐ Business ☑ Individual      First Defendant: ☑ Business ☐ Individual
☐ Government ☐ Other          ☐ Government ☐ Other

**NATURE OF SUIT:** Select primary cause of action, by checking box (check only one) that best characterizes your action:

**TORTS: PERSONAL INJURY**
☐ WDEA - Wrongful Death
☐ TONG - Negligence: General
☐ TOMV - Negligence: Motor Vehicle
☐ TOWA - Wantonness
☐ TOPL - Product Liability/AEMLD
☐ TOMM - Malpractice-Medical
☐ TOLM - Malpractice-Legal
☐ TOOM - Malpractice-Other
☑ TBFM - Fraud/Bad Faith/Misrepresentation
☐ TOXX - Other: _____

**TORTS: PERSONAL INJURY**
☐ TOPE - Personal Property
☐ TORE - Real Property

**OTHER CIVIL FILINGS**
☐ ABAN - Abandoned Automobile
☐ ACCT - Account & Nonmortgage
☐ APAA - Administrative Agency Appeal
☐ ADPA - Administrative Procedure Act
☐ ANPS - Adults in Need of Protective Service

**OTHER CIVIL FILINGS (cont'd)**
☐ MSXX - Birth/Death Certificate Modification/Bond Forfeiture Appeal/Enforcement of Agency Subpoena/Petition to Preserve
☐ CVRT - Civil Rights
☐ COND - Condemnation/Eminent Domain/Right-of-Way
☐ CTMP - Contempt of Court
☐ CONT - Contract/Ejectment/Writ of Seizure
☐ TOCN - Conversion
☐ EQND - Equity Non-Damages Actions/Declaratory Judgment/Injunction Election Contest/Quiet Title/Sale For Division
☐ CVUD - Eviction Appeal/Unlawful Detainer
☐ FORJ - Foreign Judgment
☐ FORF - Fruits of Crime Forfeiture
☐ MSHC - Habeas Corpus/Extraordinary Writ/Mandamus/Prohibition
☐ PFAB - Protection From Abuse
☐ EPFA - Elder Protection From Abuse
☐ QTLB - Quiet Title Land Bank
☐ FELA - Railroad/Seaman (FELA)
☐ RPRO - Real Property
☐ WTEG - Will/Trust/Estate/Guardianship/Conservatorship
☐ COMP - Workers' Compensation
☐ CVXX - Miscellaneous Circuit Civil Case

**ORIGIN:** F ☑ INITIAL FILING      P ☐ APPEAL FROM PROBATE COURT

A ☐ APPEAL FROM DISTRICT COURT      O ☐ OTHER

**HAS JURY TRIAL BEEN DEMANDED?** ☑ YES ☐ NO    Note: Checking "Yes" does not constitute a demand for a jury trial. (See Rules 38 and 39, Ala.R.Civ.P, for procedure)

**RELIEF REQUESTED:** ☑ MONETARY AWARD REQUESTED ☐ NO MONETARY AWARD REQUESTED

**ATTORNEY CODE:**

| LIT028 | 12/15/2025 1:00:46 PM | /s/ Carolyn Elizabeth Littell |
|---|---|---|
| | Date | Signature of Attorney/Party filing this form |

**MEDIATION REQUESTED:** ☐ YES ☑ NO ☐ UNDECIDED

**Election to Proceed under the Alabama Rules for Expedited Civil Actions:** ☐ YES ☑ NO

DOCUMENT 2

ELECTRONICALLY FILED
12/15/2025 1:00 PM
06-CV-2025-900048.00
CIRCUIT COURT OF
BARBOUR COUNTY, ALABAMA
PAIGE SMITH, CLERK

IN THE CIRCUIT COURT OF
BARBOUR COUNTY, ALABAMA
CLAYTON DIVISION

ALEXIS BIANCA ADAMS; CHRISTAL
DENISE ANGLIN; CHRISTOPHER LEMONT
ANGLIN; JAMES ELBERT ANGLIN JR;
DEVAN TAMAR BAXTE; BRUCE
CODERRICK BAXTER; DENISE
BLACKMON; ARTHUR LEE BLAKELY, JR.;
JAMES  BOSWELL, JR.; BETTY JO BOYKIN;
EZEKEL  BOYKIN; ALFREDA M BURKS;
BETTY ANN BURKS; BRUCE BURKS;
ANDREW CAREY; DORIS M. CAREY;
DANNY LEE CHAMBERS; ISOM RAKEEM
DAFFIN; BOBBY DANIELS; CAROLYN
WHIGHAM DANIELS; CORDARYLL
DYSHAWN DANIELS; FREDERICK
DANIELS; JACQUELINE S. DAVIS; JASMINE
RAYDEN DAVIS; CHERRY ANN DEVOSE;
DEMETRIC L DEVOSE; AMANDA
SANTORIA EUTSEY; DERRIS KENTRELL
EUTSEY; ANDREW L FORD; FELICIA
DENISE FORD; BOBBIE JEAN FREEMAN;
ANGELO TERRELL GILBERT; APRIAL
LATRECE GRIMSLEY; BRANDON GUICE;
FELICIA MICHELLE GULLETTE; DEVIN
DEVOR HAMILTON; DONNIE DANYEL
HAMILTON; GRADEAN HICKS; ELOIS
HILL; FLOYD HILL; BRIANA LENAI HOBDY;
CHRISTOPHER DWAYNE JACKSON;
ANTHONY ANTWAN JOHNSON; BRENDA
NETTER JOHNSON; CHRISTOPHER JAMAR
JONES; ISAAC ANTIONE JONES; CHARLES
E. KENNEDY; ERIC DEON KENNEDY;
ANTOINE LAMETRIUS KING WALKER;
EVELYN KENNEDY LAMPLEY; CELICIA K
LEDBETTER; CHARLIE LOHMAN; CHELSEA
RAQUEL LOHMAN; COREY JAMAR
LOHMAN; GEORGIA LEE MARSHALL;

1

JAMES CARL MASSEY, JR.; DANIEL LEE
MCCLENDON; BARBARA KATE MCCOY;
ANGIE BIANCA MCKINNON; ANTHONY
MCKINNON; DONTAVIOUS QUANTREL
PAIGE; BETTY JEAN PEARISON; JARVIUS
PERSON; BENJAMIN PHILLIPS; GARY
WAYNE PRATT JR.; ARLEASIA JUANARIA
REDDING; JAMES MARRIN REDDING;
GLADYS VIRGINIA RODGERS; CHARLIE
LEE RUMPH; CHIQUITA TEQUILA RUMPH;
D'ANDREA DENISE RUMPH; ELOIS E
RUMPH; FELICIA MICHELLE RUSSAW;
FREDERICK MONTA RUSSAW; GOODLOW
RUSSAW; ANNIE LUE RUSSAW MCCOY;
ALEANE SCARVER; ALESHA RENEE
SCARVER; EDWARD MORRIS SCARVER;
DENEKKA KEMKISHA STARKS;
CATRINNA KYLES TANNIRU; BARBARA
LANELL TEW; DONNIE BERNARD
THOMAS; FREDDIE B. THOMAS; FREDDIE
RAMONE THOMAS; CHAKA YOLANDA
THOMPKINS; JAMES CALVIN VICKERS;
BOBBIE REE WALKER; CHARLES EDWARD
WHITE; CHARLIE MAE WRIGHT; GLENDA
F. YOUNG
    *Plaintiffs,*

    v.                                              CIVIL ACTION NO. CV-

AGRI STATS, INC.; PERDUE FARMS, INC.;            COMPLAINT
PERDUE FOODS, LLC; TYSON FOODS, INC.,
is successor to KEYSTONE FOODS, LLC;            Jury Trial Demand
EQUITY GROUP, and CHAROEN
PHOPKHAND; FOODS; PILGRIM'S PRIDE
CORPORATION; WAYNE FARMS, LLC;
WAYNE-SANDERSON FARMS, LLC,  the
successor entity resulting from the merger of
Sanderson Farms, Inc. and Wayne Farms, LLC;
CARGILL MEAT SOLUTIONS, INC.;

2

CONTINENTAL GRAIN COMPANY; PECO
FOODS, INC.; FOSTER POULTRY FARMS,
LLC; Fictitious Defendant A-BB,

    *Defendants.*

## COMPLAINT

    **COME NOW** the plaintiffs in the above styled cause and bring this action against the defendants, named and fictitious as says unto the Court as follows:

### INTRODUCTION

1. This action is brought to remedy a secret, multi-decade conspiracy orchestrated by America's largest poultry processing companies. While holding themselves out to the public as fierce competitors, these corporate giants privately colluded to systematically fix, depress, and stabilize the compensation paid to hundreds of thousands of their most vulnerable employees.

2. Through "off the books" meetings, illicit exchanges of competitively sensitive data facilitated by consulting firms, and direct plant-to-plant communications, the defendants formed an unlawful cartel to suppress labor costs and maximize their own profits. This conduct, which resulted in artificially depressed wages and benefits for the plaintiffs and other workers, constitutes a flagrant and ongoing violation of the laws of the State of Alabama.

### JURISDICTION AND VENUE

1. This Court has subject matter jurisdiction over the claims asserted herein pursuant to the laws and Constitution of the State of Alabama.

2. Venue is proper in Barbour County, Alabama, pursuant to   as one or more of the defendants transact or during the relevant time period transacted business within this jurisdiction, regularly, systemically and actively, and the wrongful acts and omissions alleged herein occurred in or had substantial effects within this county, including the plaintiffs.

3. The amount in controversy for each individual plaintiff is no more than $74,999.99 per Plaintiff.

3

## PARTIES

**Plaintiffs**

1.  Plaintiff, ALEXIS BIANCA ADAMS, is a citizen and resident of the State of Alabama. During the relevant period, Plaintiff was employed by one or more of the defendant Processors. As a direct and proximate result of the defendants' unlawful conduct, they suffered economic damages in the form of suppressed wages and benefits, as well as severe emotional distress.

2.  Plaintiff, CHRISTAL DENISE ANGLIN, is a citizen and resident of the State of Alabama. During the relevant period, Plaintiff was employed by one or more of the defendant Processors. As a direct and proximate result of the defendants' unlawful conduct, they suffered economic damages in the form of suppressed wages and benefits, as well as severe emotional distress.

3.  Plaintiff, CHRISTOPHER LEMONT ANGLIN, is a citizen and resident of the State of Alabama. During the relevant period, Plaintiff was employed by one or more of the defendant Processors. As a direct and proximate result of the defendants' unlawful conduct, they suffered economic damages in the form of suppressed wages and benefits, as well as severe emotional distress.

4.  Plaintiff, JAMES ELBERT ANGLIN JR., is a citizen and resident of the State of Alabama. During the relevant period, Plaintiff was employed by one or more of the defendant Processors. As a direct and proximate result of the defendants' unlawful conduct, they suffered economic damages in the form of suppressed wages and benefits, as well as severe emotional distress.

5.  Plaintiff, DEVAN TAMAR BAXTE, is a citizen and resident of the State of Alabama. During the relevant period, Plaintiff was employed by one or more of the defendant Processors. As a direct and proximate result of the defendants' unlawful conduct, they suffered economic damages in the form of suppressed wages and benefits, as well as severe emotional distress.

6.  Plaintiff, BRUCE CODERRICK BAXTER, is a citizen and resident of the State of Alabama. During the relevant period, Plaintiff was employed by one or more of the defendant Processors. As a direct and proximate result of the defendants'

4

unlawful conduct, they suffered economic damages in the form of suppressed wages and benefits, as well as severe emotional distress.

7. Plaintiff, DENISE BLACKMON, is a citizen and resident of the State of Alabama. During the relevant period, Plaintiff was employed by one or more of the defendant Processors. As a direct and proximate result of the defendants' unlawful conduct, they suffered economic damages in the form of suppressed wages and benefits, as well as severe emotional distress.

8. Plaintiff, ARTHUR LEE BLAKELY, JR., is a citizen and resident of the State of Alabama. During the relevant period, Plaintiff was employed by one or more of the defendant Processors. As a direct and proximate result of the defendants' unlawful conduct, they suffered economic damages in the form of suppressed wages and benefits, as well as severe emotional distress.

9. Plaintiff, JAMES BOSWELL, JR.,   is a citizen and resident of the State of Alabama. During the relevant period, Plaintiff was employed by one or more of the defendant Processors. As a direct and proximate result of the defendants' unlawful conduct, they suffered economic damages in the form of suppressed wages and benefits, as well as severe emotional distress.

10. Plaintiff, BETTY JO BOYKIN, is a citizen and resident of the State of Alabama. During the relevant period, Plaintiff was employed by one or more of the defendant Processors. As a direct and proximate result of the defendants' unlawful conduct, they suffered economic damages in the form of suppressed wages and benefits, as well as severe emotional distress.

11. Plaintiff, EZEKEL BOYKIN, is a citizen and resident of the State of Alabama. During the relevant period, Plaintiff was employed by one or more of the defendant Processors. As a direct and proximate result of the defendants' unlawful conduct, they suffered economic damages in the form of suppressed wages and benefits, as well as severe emotional distress.

12. Plaintiff, ALFREDA M BURKS, is a citizen and resident of the State of Alabama. During the relevant period, Plaintiff was employed by one or more of the defendant Processors. As a direct and proximate result of the defendants' unlawful conduct, they suffered economic damages in the form of suppressed wages and benefits, as well as severe emotional distress.

5

13. Plaintiff, BETTY ANN BURKS, is a citizen and resident of the State of Alabama. During the relevant period, Plaintiff was employed by one or more of the defendant Processors. As a direct and proximate result of the defendants' unlawful conduct, they suffered economic damages in the form of suppressed wages and benefits, as well as severe emotional distress.

14. Plaintiff, BRUCE BURKS, is a citizen and resident of the State of Alabama. During the relevant period, Plaintiff was employed by one or more of the defendant Processors. As a direct and proximate result of the defendants' unlawful conduct, they suffered economic damages in the form of suppressed wages and benefits, as well as severe emotional distress.

15. Plaintiff, ANDREW CAREY, is a citizen and resident of the State of Alabama. During the relevant period, Plaintiff was employed by one or more of the defendant Processors. As a direct and proximate result of the defendants' unlawful conduct, they suffered economic damages in the form of suppressed wages and benefits, as well as severe emotional distress.

16. Plaintiff, DORIS M CAREY, is a citizen and resident of the State of Alabama. During the relevant period, Plaintiff was employed by one or more of the defendant Processors. As a direct and proximate result of the defendants' unlawful conduct, they suffered economic damages in the form of suppressed wages and benefits, as well as severe emotional distress.

17. Plaintiff, DANNY LEE CHAMBERS, is a citizen and resident of the State of Alabama. During the relevant period, Plaintiff was employed by one or more of the defendant Processors. As a direct and proximate result of the defendants' unlawful conduct, they suffered economic damages in the form of suppressed wages and benefits, as well as severe emotional distress.

18. Plaintiff, ISOM RAKEEM DAFFIN, is a citizen and resident of the State of Alabama. During the relevant period, Plaintiff was employed by one or more of the defendant Processors. As a direct and proximate result of the defendants' unlawful conduct, they suffered economic damages in the form of suppressed wages and benefits, as well as severe emotional distress.

19. Plaintiff, BOBBY DANIELS, is a citizen and resident of the State of Alabama. During the relevant period, Plaintiff was employed by one or more of the

defendant Processors. As a direct and proximate result of the defendants' unlawful conduct, they suffered economic damages in the form of suppressed wages and benefits, as well as severe emotional distress.

20. Plaintiff, CAROLYN WHIGHAM DANIELS, is a citizen and resident of the State of Alabama. During the relevant period, Plaintiff was employed by one or more of the defendant Processors. As a direct and proximate result of the defendants' unlawful conduct, they suffered economic damages in the form of suppressed wages and benefits, as well as severe emotional distress.

21. Plaintiff, CORDARYLL DYSHAWN DANIELS, is a citizen and resident of the State of Alabama. During the relevant period, Plaintiff was employed by one or more of the defendant Processors. As a direct and proximate result of the defendants' unlawful conduct, they suffered economic damages in the form of suppressed wages and benefits, as well as severe emotional distress.

22. Plaintiff, FREDERICK DANIELS, is a citizen and resident of the State of Alabama. During the relevant period, Plaintiff was employed by one or more of the defendant Processors. As a direct and proximate result of the defendants' unlawful conduct, they suffered economic damages in the form of suppressed wages and benefits, as well as severe emotional distress.

23. Plaintiff, JACQUELINE S. DAVIS, is a citizen and resident of the State of Alabama. During the relevant period, Plaintiff was employed by one or more of the defendant Processors. As a direct and proximate result of the defendants' unlawful conduct, they suffered economic damages in the form of suppressed wages and benefits, as well as severe emotional distress.

24. Plaintiff, JASMINE RAYDEN DAVIS, is a citizen and resident of the State of Alabama. During the relevant period, Plaintiff was employed by one or more of the defendant Processors. As a direct and proximate result of the defendants' unlawful conduct, they suffered economic damages in the form of suppressed wages and benefits, as well as severe emotional distress.

25. Plaintiff, CHERRY ANN DEVOSE, is a citizen and resident of the State of Alabama. During the relevant period, Plaintiff was employed by one or more of the defendant Processors. As a direct and proximate result of the defendants' unlawful

conduct, they suffered economic damages in the form of suppressed wages and benefits, as well as severe emotional distress.

26. Plaintiff, DEMETRIC L. DEVOSE, is a citizen and resident of the State of Alabama. During the relevant period, Plaintiff was employed by one or more of the defendant Processors. As a direct and proximate result of the defendants' unlawful conduct, they suffered economic damages in the form of suppressed wages and benefits, as well as severe emotional distress.

27. Plaintiff, AMANDA SANTORIA EUTSEY, is a citizen and resident of the State of Alabama. During the relevant period, Plaintiff was employed by one or more of the defendant Processors. As a direct and proximate result of the defendants' unlawful conduct, they suffered economic damages in the form of suppressed wages and benefits, as well as severe emotional distress.

28. Plaintiff, DERRIS KENTRELL EUTSEY, is a citizen and resident of the State of Alabama. During the relevant period, Plaintiff was employed by one or more of the defendant Processors. As a direct and proximate result of the defendants' unlawful conduct, they suffered economic damages in the form of suppressed wages and benefits, as well as severe emotional distress.

29. Plaintiff, ANDREW L FORD, is a citizen and resident of the State of Alabama. During the relevant period, Plaintiff was employed by one or more of the defendant Processors. As a direct and proximate result of the defendants' unlawful conduct, they suffered economic damages in the form of suppressed wages and benefits, as well as severe emotional distress.

30. Plaintiff, FELICIA DENISE FORD, is a citizen and resident of the State of Alabama. During the relevant period, Plaintiff was employed by one or more of the defendant Processors. As a direct and proximate result of the defendants' unlawful conduct, they suffered economic damages in the form of suppressed wages and benefits, as well as severe emotional distress.

31. Plaintiff, BOBBIE JEAN FREEMAN, is a citizen and resident of the State of Alabama. During the relevant period, Plaintiff was employed by one or more of the defendant Processors. As a direct and proximate result of the defendants' unlawful conduct, they suffered economic damages in the form of suppressed wages and benefits, as well as severe emotional distress.

32. Plaintiff, ANGELO TERRELL GILBERT, is a citizen and resident of the State of Alabama. During the relevant period, Plaintiff was employed by one or more of the defendant Processors. As a direct and proximate result of the defendants' unlawful conduct, they suffered economic damages in the form of suppressed wages and benefits, as well as severe emotional distress.

33. Plaintiff, APRIAL LATRECE GRIMSLEY, is a citizen and resident of the State of Alabama. During the relevant period, Plaintiff was employed by one or more of the defendant Processors. As a direct and proximate result of the defendants' unlawful conduct, they suffered economic damages in the form of suppressed wages and benefits, as well as severe emotional distress.

34. Plaintiff, BRANDON GUICE, is a citizen and resident of the State of Alabama. During the relevant period, Plaintiff was employed by one or more of the defendant Processors. As a direct and proximate result of the defendants' unlawful conduct, they suffered economic damages in the form of suppressed wages and benefits, as well as severe emotional distress.

35. Plaintiff, FELICIA MICHELLE GULLETTE, is a citizen and resident of the State of Alabama. During the relevant period, Plaintiff was employed by one or more of the defendant Processors. As a direct and proximate result of the defendants' unlawful conduct, they suffered economic damages in the form of suppressed wages and benefits, as well as severe emotional distress.

36. Plaintiff, DEVIN DEVOR HAMILTON, is a citizen and resident of the State of Alabama. During the relevant period, Plaintiff was employed by one or more of the defendant Processors. As a direct and proximate result of the defendants' unlawful conduct, they suffered economic damages in the form of suppressed wages and benefits, as well as severe emotional distress.

37. Plaintiff, DONNIE DANYEL HAMILTON, is a citizen and resident of the State of Alabama. During the relevant period, Plaintiff was employed by one or more of the defendant Processors. As a direct and proximate result of the defendants' unlawful conduct, they suffered economic damages in the form of suppressed wages and benefits, as well as severe emotional distress.

38. Plaintiff, GRADEAN HICKS, is a citizen and resident of the State of Alabama. During the relevant period, Plaintiff was employed by one or more of the

defendant Processors. As a direct and proximate result of the defendants' unlawful conduct, they suffered economic damages in the form of suppressed wages and benefits, as well as severe emotional distress.

39. Plaintiff, ELOIS HILL, is a citizen and resident of the State of Alabama. During the relevant period, Plaintiff was employed by one or more of the defendant Processors. As a direct and proximate result of the defendants' unlawful conduct, they suffered economic damages in the form of suppressed wages and benefits, as well as severe emotional distress.

40. Plaintiff, FLOYD HILL, is a citizen and resident of the State of Alabama. During the relevant period, Plaintiff was employed by one or more of the defendant Processors. As a direct and proximate result of the defendants' unlawful conduct, they suffered economic damages in the form of suppressed wages and benefits, as well as severe emotional distress.

41. Plaintiff, BRIANA LENAI HOBDY, is a citizen and resident of the State of Alabama. During the relevant period, Plaintiff was employed by one or more of the defendant Processors. As a direct and proximate result of the defendants' unlawful conduct, they suffered economic damages in the form of suppressed wages and benefits, as well as severe emotional distress.

42. Plaintiff, CHRISTOPHER DWAYNE JACKSON, is a citizen and resident of the State of Alabama. During the relevant period, Plaintiff was employed by one or more of the defendant Processors. As a direct and proximate result of the defendants' unlawful conduct, they suffered economic damages in the form of suppressed wages and benefits, as well as severe emotional distress.

43. Plaintiff, ANTHONY ANTWAN JOHNSON, is a citizen and resident of the State of Alabama. During the relevant period, Plaintiff was employed by one or more of the defendant Processors. As a direct and proximate result of the defendants' unlawful conduct, they suffered economic damages in the form of suppressed wages and benefits, as well as severe emotional distress.

44. Plaintiff, BRENDA NETTER JOHNSON, is a citizen and resident of the State of Alabama. During the relevant period, Plaintiff was employed by one or more of the defendant Processors. As a direct and proximate result of the defendants'

unlawful conduct, they suffered economic damages in the form of suppressed wages and benefits, as well as severe emotional distress.

45. Plaintiff, CHRISTOPHER JAMAR JONES, is a citizen and resident of the State of Alabama. During the relevant period, Plaintiff was employed by one or more of the defendant Processors. As a direct and proximate result of the defendants' unlawful conduct, they suffered economic damages in the form of suppressed wages and benefits, as well as severe emotional distress.

46. Plaintiff, ISAAC ANTIONE JONES, is a citizen and resident of the State of Alabama. During the relevant period, Plaintiff was employed by one or more of the defendant Processors. As a direct and proximate result of the defendants' unlawful conduct, they suffered economic damages in the form of suppressed wages and benefits, as well as severe emotional distress.

47. Plaintiff, CHARLES E KENNEDY, is a citizen and resident of the State of Alabama. During the relevant period, Plaintiff was employed by one or more of the defendant Processors. As a direct and proximate result of the defendants' unlawful conduct, they suffered economic damages in the form of suppressed wages and benefits, as well as severe emotional distress.

48. Plaintiff, ERIC DEON KENNEDY, is a citizen and resident of the State of Alabama. During the relevant period, Plaintiff was employed by one or more of the defendant Processors. As a direct and proximate result of the defendants' unlawful conduct, they suffered economic damages in the form of suppressed wages and benefits, as well as severe emotional distress.

49. Plaintiff, ANTOINE LAMETRIUS KING WALKER, is a citizen and resident of the State of Alabama. During the relevant period, Plaintiff was employed by one or more of the defendant Processors. As a direct and proximate result of the defendants' unlawful conduct, they suffered economic damages in the form of suppressed wages and benefits, as well as severe emotional distress.

50. Plaintiff, EVELYN KENNEDY LAMPLEY, is a citizen and resident of the State of Alabama. During the relevant period, Plaintiff was employed by one or more of the defendant Processors. As a direct and proximate result of the defendants' unlawful conduct, they suffered economic damages in the form of suppressed wages and benefits, as well as severe emotional distress.

11

51. Plaintiff, CELICIA K LEDBETTER, is a citizen and resident of the State of Alabama. During the relevant period, Plaintiff was employed by one or more of the defendant Processors. As a direct and proximate result of the defendants' unlawful conduct, they suffered economic damages in the form of suppressed wages and benefits, as well as severe emotional distress.

52. Plaintiff, CHARLIE LOHMAN, is a citizen and resident of the State of Alabama. During the relevant period, Plaintiff was employed by one or more of the defendant Processors. As a direct and proximate result of the defendants' unlawful conduct, they suffered economic damages in the form of suppressed wages and benefits, as well as severe emotional distress.

53. Plaintiff, CHELSEA RAQUEL LOHMAN, is a citizen and resident of the State of Alabama. During the relevant period, Plaintiff was employed by one or more of the defendant Processors. As a direct and proximate result of the defendants' unlawful conduct, they suffered economic damages in the form of suppressed wages and benefits, as well as severe emotional distress.

54. Plaintiff, COREY JAMAR LOHMAN, is a citizen and resident of the State of Alabama. During the relevant period, Plaintiff was employed by one or more of the defendant Processors. As a direct and proximate result of the defendants' unlawful conduct, they suffered economic damages in the form of suppressed wages and benefits, as well as severe emotional distress.

55. Plaintiff, GEORGIA LEE MARSHALL, is a citizen and resident of the State of Alabama. During the relevant period, Plaintiff was employed by one or more of the defendant Processors. As a direct and proximate result of the defendants' unlawful conduct, they suffered economic damages in the form of suppressed wages and benefits, as well as severe emotional distress.

56. Plaintiff, JAMES CARL MASSEY, JR., is a citizen and resident of the State of Alabama. During the relevant period, Plaintiff was employed by one or more of the defendant Processors. As a direct and proximate result of the defendants' unlawful conduct, they suffered economic damages in the form of suppressed wages and benefits, as well as severe emotional distress.

57. Plaintiff, DANIEL LEE MCCLENDON, is a citizen and resident of the State of Alabama. During the relevant period, Plaintiff was employed by one or more of

the defendant Processors. As a direct and proximate result of the defendants' unlawful conduct, they suffered economic damages in the form of suppressed wages and benefits, as well as severe emotional distress.

58. Plaintiff, BARBARA KATE MCCOY, is a citizen and resident of the State of Alabama. During the relevant period, Plaintiff was employed by one or more of the defendant Processors. As a direct and proximate result of the defendants' unlawful conduct, they suffered economic damages in the form of suppressed wages and benefits, as well as severe emotional distress.

59. Plaintiff, ANGIE BIANCA MCKINNON, is a citizen and resident of the State of Alabama. During the relevant period, Plaintiff was employed by one or more of the defendant Processors. As a direct and proximate result of the defendants' unlawful conduct, they suffered economic damages in the form of suppressed wages and benefits, as well as severe emotional distress.

60. Plaintiff, ANTHONY MCKINNON, is a citizen and resident of the State of Alabama. During the relevant period, Plaintiff was employed by one or more of the defendant Processors. As a direct and proximate result of the defendants' unlawful conduct, they suffered economic damages in the form of suppressed wages and benefits, as well as severe emotional distress.

61. Plaintiff, DONTAVIOUS QUANTREL PAIGE, is a citizen and resident of the State of Alabama. During the relevant period, Plaintiff was employed by one or more of the defendant Processors. As a direct and proximate result of the defendants' unlawful conduct, they suffered economic damages in the form of suppressed wages and benefits, as well as severe emotional distress.

62. Plaintiff, BETTY JEAN PEARISON, is a citizen and resident of the State of Alabama. During the relevant period, Plaintiff was employed by one or more of the defendant Processors. As a direct and proximate result of the defendants' unlawful conduct, they suffered economic damages in the form of suppressed wages and benefits, as well as severe emotional distress.

63. Plaintiff, JARVIUS PERSON, is a citizen and resident of the State of Alabama. During the relevant period, Plaintiff was employed by one or more of the defendant Processors. As a direct and proximate result of the defendants' unlawful

DOCUMENT 7

conduct, they suffered economic damages in the form of suppressed wages and benefits, as well as severe emotional distress.

64. Plaintiff, BENJAMIN PHILLIPS, is a citizen and resident of the State of Alabama. During the relevant period, Plaintiff was employed by one or more of the defendant Processors. As a direct and proximate result of the defendants' unlawful conduct, they suffered economic damages in the form of suppressed wages and benefits, as well as severe emotional distress.

65. Plaintiff, GARY WAYNE PRATT JR., is a citizen and resident of the State of Alabama. During the relevant period, Plaintiff was employed by one or more of the defendant Processors. As a direct and proximate result of the defendants' unlawful conduct, they suffered economic damages in the form of suppressed wages and benefits, as well as severe emotional distress.

66. Plaintiff, ARLEASIA JUANARIA REDDING, is a citizen and resident of the State of Alabama. During the relevant period, Plaintiff was employed by one or more of the defendant Processors. As a direct and proximate result of the defendants' unlawful conduct, they suffered economic damages in the form of suppressed wages and benefits, as well as severe emotional distress.

67. Plaintiff, JAMES MARRIN REDDING, is a citizen and resident of the State of Alabama. During the relevant period, Plaintiff was employed by one or more of the defendant Processors. As a direct and proximate result of the defendants' unlawful conduct, they suffered economic damages in the form of suppressed wages and benefits, as well as severe emotional distress.

68. Plaintiff, GLADYS VIRGINIA RODGERS, is a citizen and resident of the State of Alabama. During the relevant period, Plaintiff was employed by one or more of the defendant Processors. As a direct and proximate result of the defendants' unlawful conduct, they suffered economic damages in the form of suppressed wages and benefits, as well as severe emotional distress.

69. Plaintiff, CHARLIE LEE RUMPH, is a citizen and resident of the State of Alabama. During the relevant period, Plaintiff was employed by one or more of the defendant Processors. As a direct and proximate result of the defendants' unlawful conduct, they suffered economic damages in the form of suppressed wages and benefits, as well as severe emotional distress.

14

70. Plaintiff, CHIQUITA TEQUILA RUMPH, is a citizen and resident of the State of Alabama. During the relevant period, Plaintiff was employed by one or more of the defendant Processors. As a direct and proximate result of the defendants' unlawful conduct, they suffered economic damages in the form of suppressed wages and benefits, as well as severe emotional distress.

71. Plaintiff, D'ANDREA DENISE RUMPH, is a citizen and resident of the State of Alabama. During the relevant period, Plaintiff was employed by one or more of the defendant Processors. As a direct and proximate result of the defendants' unlawful conduct, they suffered economic damages in the form of suppressed wages and benefits, as well as severe emotional distress.

72. Plaintiff, ELOIS E. RUMPH, is a citizen and resident of the State of Alabama. During the relevant period, Plaintiff was employed by one or more of the defendant Processors. As a direct and proximate result of the defendants' unlawful conduct, they suffered economic damages in the form of suppressed wages and benefits, as well as severe emotional distress.

73. Plaintiff, FELICIA MICHELLE RUSSAW, is a citizen and resident of the State of Alabama. During the relevant period, Plaintiff was employed by one or more of the defendant Processors. As a direct and proximate result of the defendants' unlawful conduct, they suffered economic damages in the form of suppressed wages and benefits, as well as severe emotional distress.

74. Plaintiff, FREDERICK MONTA RUSSAW, is a citizen and resident of the State of Alabama. During the relevant period, Plaintiff was employed by one or more of the defendant Processors. As a direct and proximate result of the defendants' unlawful conduct, they suffered economic damages in the form of suppressed wages and benefits, as well as severe emotional distress.

75. Plaintiff, GOODLOW RUSSAW, is a citizen and resident of the State of Alabama. During the relevant period, Plaintiff was employed by one or more of the defendant Processors. As a direct and proximate result of the defendants' unlawful conduct, they suffered economic damages in the form of suppressed wages and benefits, as well as severe emotional distress.

76. Plaintiff, ANNIE LUE RUSSAW MCCOY, is a citizen and resident of the State of Alabama. During the relevant period, Plaintiff was employed by one or more of

the defendant Processors. As a direct and proximate result of the defendants' unlawful conduct, they suffered economic damages in the form of suppressed wages and benefits, as well as severe emotional distress.

77. Plaintiff, ALEANE SCARVER, is a citizen and resident of the State of Alabama. During the relevant period, Plaintiff was employed by one or more of the defendant Processors. As a direct and proximate result of the defendants' unlawful conduct, they suffered economic damages in the form of suppressed wages and benefits, as well as severe emotional distress.

78. Plaintiff, ALESHA RENEE SCARVER, is a citizen and resident of the State of Alabama. During the relevant period, Plaintiff was employed by one or more of the defendant Processors. As a direct and proximate result of the defendants' unlawful conduct, they suffered economic damages in the form of suppressed wages and benefits, as well as severe emotional distress.

79. Plaintiff, EDWARD MORRIS SCARVER, is a citizen and resident of the State of Alabama. During the relevant period, Plaintiff was employed by one or more of the defendant Processors. As a direct and proximate result of the defendants' unlawful conduct, they suffered economic damages in the form of suppressed wages and benefits, as well as severe emotional distress.

80. Plaintiff, DENEKKA KEMKISHA STARKS, is a citizen and resident of the State of Alabama. During the relevant period, Plaintiff was employed by one or more of the defendant Processors. As a direct and proximate result of the defendants' unlawful conduct, they suffered economic damages in the form of suppressed wages and benefits, as well as severe emotional distress.

81. Plaintiff, CATRINNA KYLES TANNIRU, is a citizen and resident of the State of Alabama. During the relevant period, Plaintiff was employed by one or more of the defendant Processors. As a direct and proximate result of the defendants' unlawful conduct, they suffered economic damages in the form of suppressed wages and benefits, as well as severe emotional distress.

82. Plaintiff, BARBARA LANELL TEW, is a citizen and resident of the State of Alabama. During the relevant period, Plaintiff was employed by one or more of the defendant Processors. As a direct and proximate result of the defendants'

16

unlawful conduct, they suffered economic damages in the form of suppressed wages and benefits, as well as severe emotional distress.

83. Plaintiff, DONNIE BERNARD THOMAS, is a citizen and resident of the State of Alabama. During the relevant period, Plaintiff was employed by one or more of the defendant Processors. As a direct and proximate result of the defendants' unlawful conduct, they suffered economic damages in the form of suppressed wages and benefits, as well as severe emotional distress.

84. Plaintiff, FREDDIE B. THOMAS, is a citizen and resident of the State of Alabama. During the relevant period, Plaintiff was employed by one or more of the defendant Processors. As a direct and proximate result of the defendants' unlawful conduct, they suffered economic damages in the form of suppressed wages and benefits, as well as severe emotional distress.

85. Plaintiff, FREDDIE RAMONE THOMAS, is a citizen and resident of the State of Alabama. During the relevant period, Plaintiff was employed by one or more of the defendant Processors. As a direct and proximate result of the defendants' unlawful conduct, they suffered economic damages in the form of suppressed wages and benefits, as well as severe emotional distress.

86. Plaintiff, CHAKA YOLANDA THOMPKINS, is a citizen and resident of the State of Alabama. During the relevant period, Plaintiff was employed by one or more of the defendant Processors. As a direct and proximate result of the defendants' unlawful conduct, they suffered economic damages in the form of suppressed wages and benefits, as well as severe emotional distress.

87. Plaintiff, JAMES CALVIN VICKERS, is a citizen and resident of the State of Alabama. During the relevant period, Plaintiff was employed by one or more of the defendant Processors. As a direct and proximate result of the defendants' unlawful conduct, they suffered economic damages in the form of suppressed wages and benefits, as well as severe emotional distress.

88. Plaintiff, BOBBIE REE WALKER, is a citizen and resident of the State of Alabama. During the relevant period, Plaintiff was employed by one or more of the defendant Processors. As a direct and proximate result of the defendants' unlawful conduct, they suffered economic damages in the form of suppressed wages and benefits, as well as severe emotional distress.

17

89. Plaintiff, CHARLES EDWARD WHITE, is a citizen and resident of the State of Alabama. During the relevant period, Plaintiff was employed by one or more of the defendant Processors. As a direct and proximate result of the defendants' unlawful conduct, they suffered economic damages in the form of suppressed wages and benefits, as well as severe emotional distress.

90. Plaintiff, CHARLIE MAE WRIGHT, is a citizen and resident of the State of Alabama. During the relevant period, Plaintiff was employed by one or more of the defendant Processors. As a direct and proximate result of the defendants' unlawful conduct, they suffered economic damages in the form of suppressed wages and benefits, as well as severe emotional distress.

91. Plaintiff, GLENDA F YOUNG, is a citizen and resident of the State of Alabama. During the relevant period, Plaintiff was employed by one or more of the defendant Processors. As a direct and proximate result of the defendants' unlawful conduct, they suffered economic damages in the form of suppressed wages and benefits, as well as severe emotional distress.

**Defendants**

1. Agri Stats, Inc., is a foreign corporation that actively solicited, serviced and maintained business services and systemically and regularly conducts or conducted business in this jurisdiction, and these business activities directly relate to the damages to the plaintiffs alleged in this action. They actively solicited and maintained business relationships with Alabama-based companies including co-conspirator defendants. They regularly visited the plants of the co-conspirator defendants in this jurisdiction and in Alabama. Agri Stats purposefully availed itself of the benefits and protections of the Alabama market. This was not passive conduct, but rather an active and continuous service provision involving data collection, auditing, and report dissemination to specific clients in the state and direct, physical presence through representatives in this jurisdiction. The harm to the Plaintiffs, receiving artificially depressed wages as a result of Agri Stats' services, contacts and participation in the conspiracy, occurred in Alabama and was directly related to Agri Stats' business activities within the state. Agri Stats provided a service that it knew or should have known directly and negatively impacted the compensation of a large workforce within this jurisdiction.

18

2. Perdue Farms, Inc., Perdue Foods, LLC, (hereinafter collectively referred to as "Perdue" unless otherwise specified") is a foreign corporation that conducts or conducted business in this jurisdiction, purposefully availed itself to the laws, rights and protections of this jurisdiction, contacts within relate to the plaintiffs' claims, their contacts are such as Defendant should reasonably anticipate being subject to this court's jurisdiction.

3. Keystone Foods, LLC, Equity Group, Charoen Phopkhand Foods all K/N/A Tyson Foods, Inc. (collectively referred to herein as "Tyson" unless otherwise specified) is a foreign corporation that conducts or conducted business in this jurisdiction during the relevant time period, purposefully availed itself to the laws, rights and protections of this jurisdiction, contacts within relate to the plaintiffs' claims, their contacts are such as defendant should reasonably anticipate being subject to this court's jurisdiction.

4. Pilgrim's Pride Corporation, is a foreign corporation that conducts or conducted business in this jurisdiction, purposefully availed itself to the laws, rights and protections of this jurisdiction, contacts within relate to the plaintiffs' claims, their contacts are such as Defendant should reasonably anticipate being subject to this court's jurisdiction.

5. Wayne Farms LLC, Wayne-Sanderson Farms LLC, Sanderson Farms, Inc., (hereinafter collectively referred to as "Sanderson" unless otherwise specified) is a foreign corporation that conducts or conducted business in this jurisdiction, purposefully availed itself to the laws, rights and protections of this jurisdiction, contacts within relate to the plaintiffs' claims, their contacts are such as Defendant should reasonably anticipate being subject to this court's jurisdiction.

6. Cargill Meat Solutions Corporation and Continental Grain Company are foreign corporations that jointly entered into a venture to operate Wayne-Sanderson Farms LLC. Wayne-Sanderson Farms LLC is a foreign limited liability company formed through the merger of Sanderson Farms, Inc. and Wayne Farms LLC. Each of these entities conducts or conducted business in this jurisdiction, has purposefully availed itself of the laws, rights, and protections of the State of Alabama, and has maintained contacts within this forum that directly relate to the

Plaintiffs' claims. Their business activities in Alabama are such that they should reasonably anticipate being subject to the jurisdiction of this Court.

7. Peco Foods, Inc., is a privately held Alabama corporation that conducts or conducted business in Alabama, purposefully availed itself to the laws, rights and protections of this jurisdiction, and their contacts within this jurisdiction relate to the plaintiffs' claims, their contacts are such as Defendant should reasonably anticipate being subject to this court's jurisdiction.

8. Foster Poultry Farms, LLC is a foreign limited liability company that conducts or conducted business in this jurisdiction during the relevant time period, purposefully availed itself to the laws, rights and protections of this jurisdiction, and their contacts within this jurisdiction relate to the plaintiffs' claims, their contacts are such as Defendant should reasonably anticipate being subject to this court's jurisdiction.

9. Fictitious defendants A-G, whether singular or plural, is that person, firm, corporation or entity that was responsible for the defendants' payroll, human resources, accounting and decisions on the setting of employee wages and benefits.

10. Fictitious defendants H-N, whether singular or plural, is that person, firm, corporation or entity that managed, supervised and/or controlled the day-to-day business dealings of the defendant producers' facility at which the plaintiff(s) were employed during the time period relevant to the allegations in this action.

11. Fictitious defendants O-U, whether singular or plural, is that entity or those entities, that individual or those individuals, other than those described above, whose negligence, wantonness, intentional conduct, willfulness, fraud, conspiracy, complicity or other wrongful conduct contributed to the cause of the occurrence made the basis of Plaintiffs' Complaint.

12. Fictitious defendants V-BB, whether singular or plural, are those entities which are the predecessors or successors-in-interest to any of those entities or individuals described above and herein.

## FACTUAL ALLEGATIONS

1. Defendants, named and fictitious, participated in a multi-decade conspiracy among the nation's dominant poultry processors including the defendant

20

processors. The purpose of this conspiracy was to eliminate competition for labor by artificially suppressing the compensation of hundreds of thousands of poultry workers, including the plaintiffs, to levels materially below what would have prevailed in a competitive market.

2. Agri Stats, Inc., is a foreign corporation that actively and directly solicited, serviced and maintained business services and systemically and regularly conducts or conducted business and provided their services in this jurisdiction, including the regular visits by Agri Stats representatives to co-conspirator defendant processing plants of defendant processors in this jurisdiction, and these business activities directly relate to the damages to the plaintiffs alleged in this action. Agri Stats established substantial ongoing contractual relationships involving physical presence in Alabama and engaged in continuing business relationships with the co-conspirator defendant processors which employed the plaintiffs and they knew or should have known these direct contacts would impact plaintiffs and those similarly situated.

3. Perdue Farms, Inc. and Perdue Foods LLC (collectively "Perdue") are integrated poultry processors with headquarters in Salisbury, Maryland. Perdue operates, or during the relevant time period operated poultry facilities across the United States including in this jurisdiction. Perdue is, or was, a central and long-standing participant in the conspiracy with co-Defendants to depress and fix wages of Plaintiffs.

4. Tyson is among the world's largest processors of chicken, beef, and pork, with headquarters in Springdale, Arkansas. Tyson operates poultry facilities throughout the United States including in this jurisdiction during the relevant time period. Tyson is, or was, a central and long-standing participant in the conspiracy with co-defendants to depress and fix wages of Plaintiffs.

5. Pilgrim's Pride Corporation ("Pilgrim's") is a major poultry processor headquartered in Greeley, Colorado. Pilgrim's operates poultry facilities across the United States including in Alabama. Pilgrim's is, or was, a core member of the conspiracy, actively participating in the annual meetings and using exchanged data from co-conspirator Agri Stats as a direct mechanism for setting and suppressing employee wages.

21

6. Sanderson Farms, Inc. ("Sanderson") is a poultry processor headquartered in Laurel, Mississippi. Sanderson Farms is, or was, a central and long-standing participant in the conspiracy with co-defendants to depress and fix wages of Plaintiffs.

7. Charoen Phopkhand Foods is a Thailand-based agro-industrial and food conglomerate and a co-conspirator with co-defendants to depress and fix wages of Plaintiffs. They operated poultry facilities across the United States including in this jurisdiction during the relevant time period. Additionally, in 2004, CP Foods sold its U.S. chicken-processing assets in Alabama. The integrated chicken business and substantial assets of Charoen Pokphand (USA) in Alabama were sold to Equity Group Eufaula Division, LLC.

8. Peco Foods Inc. is an Alabama based poultry processor headquartered in Tuscaloosa, Alabama. Peco Foods Inc. is, or was, a central and long-standing participant in the conspiracy with co-defendants to depress and fix wages of Plaintiffs.

9. Foster Poultry Farms, LLC poultry processor headquartered in Livingston, California. Foster Poultry Farms is, or was, a central and long-standing participant in the conspiracy with co-defendants to depress and fix wages of Plaintiffs.

10. Fictitious defendants A-G, whether singular or plural, is that person, firm, corporation or entity that was responsible for the defendants' payroll, human resources, accounting and decisions on the setting of employee wages and benefits.

11. Fictitious defendants H-N, whether singular or plural, is that person, firm, corporation or entity that managed, supervised and/or controlled the day-to-day business dealings of the defendant producers' facility at which the plaintiff(s) were employed during the time period relevant to the allegations in this action.

12. Fictitious defendants O-U, whether singular or plural, is that entity or those entities, that individual or those individuals, other than those described above, whose negligence, wantonness, intentional conduct, willfulness, fraud, conspiracy, complicity or other wrongful conduct contributed to the cause of the occurrence made the basis of Plaintiff's Complaint.

13. Fictitious defendants V-BB, whether singular or plural, are those entities which are the predecessors or successors-in-interest to any of those entities or individuals described above and herein.

14. The Individual HR and Plant Manager defendants are individuals whose identities are not yet fully known but who served as agents and employees of the defendant Processors. At all relevant times, these individuals acted within the line and scope of their employment. Their wrongful acts, including the direct exchange of competitively sensitive wage data with rival plants, were calculated to and did benefit their corporate employers by reducing labor costs. This conduct was known to, authorized by, and subsequently ratified by their respective employers.

15. All defendants, named and fictitious, participated in the same wage-fixing information exchange that directly suppressed wages paid to the plaintiffs causing damages.

16. All defendant producers, named and fictitious, subscribed to Agri Stats / WMS and attended meetings knowing Alabama plants and jobs were in the data set and that benchmark targets would be applied to Alabama wages causing damages to the plaintiffs and those similarly situated in this jurisdiction.

**A. The Poultry Processing Industry and its Susceptibility to Collusion**

1. The poultry processing industry possesses numerous structural characteristics, that make it uniquely susceptible to the type of long-running, collusive scheme alleged herein. These factors created an environment where the conspiracy could not only form but thrive for decades.

2. The defendant processors collectively control the majority of the U.S. poultry market. This high concentration limits the number of independent competitors, magnifies the conspirators' collective market power over labor, and simplifies the process of coordinating and policing a collusive agreement.

3. The cost of establishing a new, vertically integrated poultry processing complex, upon information and belief, exceeds $100 million. This immense capital requirement effectively prevents new competitors from entering the market to challenge the incumbents and disrupt their collusive arrangement.

4. Workers performing similar production and maintenance roles at different processing plants are largely interchangeable. This fungibility of labor makes it simple for competitors to compare and align compensation for any given position across the industry.

5. The workforce in poultry processing is disproportionately comprised of vulnerable populations, including marginalized citizens, immigrants, refugees, and asylum-seekers with limited English proficiency, education, and alternative employment options. This creates a captive labor pool that cannot easily respond to suppressed wages by seeking work elsewhere, allowing the defendants to depress compensation without fear of losing their workforce.

**B. The Decades-Long Conspiracy to Suppress Employee Compensation**

1. Upon information and belief, beginning as early as January 1, 2000, and continuing until at least July 20, 2021, the defendant Processors and their co-conspirators entered into a continuing contract, combination, and conspiracy to illegally fix, depress, maintain, and stabilize the compensation paid to their employees, including the plaintiffs, resulting in damage to plaintiffs.

2. The primary motivation for this conspiracy was to reduce labor costs—a substantial portion of each processor's operating expenses—and thereby maximize corporate profits at the direct expense of their employees. To facilitate this scheme, compensation decisions were centralized at the corporate headquarters of each defendant Processor rather than being made at the local plant level.

**C. The Mechanics of the Unlawful Conspiracy**

1. Defendant Producers did not passively receive WMS reports. Instead, competing processors formed a Poultry Industry Survey Group that collectively controlled the survey's scope, questions, participating companies, and the level of detail contained in results. A small Steering Committee of processor executives made the key decisions and met privately so that Defendants could speak candidly about compensation practices and align pay without oversight. WMS distributed survey results immediately before annual in-person compensation meetings, after which Defendants held private roundtables to coordinate how to apply the benchmarks to real-world pay decisions, including at Alabama plants.

2. The defendants executed their conspiracy through a sophisticated, multi-pronged strategy involving secretive in-person meetings, illicit information exchanges managed by third-party consultants, and direct communications between competitors.

3. A core component of the conspiracy was a series of annual in-person meetings of senior human resources and compensation executives from the competing defendant Processors.

4. These meetings were, upon information and belief, organized by a committee led by executives from defendants Tyson and Perdue, among others. Upon information and belief, these meetings were intentionally kept "off the books" to avoid creating a paper trail.

5. Upon information and belief these meetings, and the information shared, was/were to kept confidential.

6. During hours-long, private roundtable sessions executives from the defendants and others discussed survey results, agreed upon compensation rates for the coming year and chastised any processor that had deviated from previously fixed pay levels.

7. Webber, Meng, Sahl and Company, Inc. (WMS): WMS was hired to provide data to the producers under the guise of abiding by applicable regulations. WMS unwittingly provided the infrastructure for the conspiracy under a "veneer of legality." Its president, Jonathan Meng, repeatedly warned the defendant Processors that their practice of exchanging future, disaggregated compensation data violated the applicable laws. Despite these warnings, WMS, at the direction of the processors, designed surveys to collect this data, resulting in sham anonymization, and its representatives were excluded from private "roundtable sessions" where illicit and conspiratorial agreements were being made.

8. The survey's framework was used as a pretext to hide Defendants' conspiracy from employees and the public. By routing their wage exchanges through WMS while dictating unlawful levels of detail and future-looking content, Defendants concealed material facts: that they were no longer competing for labor in Alabama and were instead jointly suppressing compensation. This concealment and

coordinated conduct form part of the fraudulent scheme, civil conspiracy, and unjust enrichment described in this Complaint.

**2. Illicit Information Exchanges Facilitated by Agri Stats**

1. **Webber, Meng, Sahl & Co. (WMS)** was hired to administer an annual "Poultry Industry Compensation Survey," providing a veil of legality to the information exchange.

   a. The survey was designed by the processors' Steering Committee to collect detailed data on wages, salaries, and benefits. Crucially, against the repeated warnings of WMS President Jonathan Meng the survey collected future compensation data, including planned salary increases and their timing.

   b. Mr. Meng ultimately concluded that the processors hired WMS to "create an appearance of compliance" while they "continued to exchange disaggregated and deanonymized compensation data and continued to discuss and harmonize their compensation practices."

2. The survey employed an anonymization technique, replacing company names with letter codes. However, the reports contained such granular detail (e.g., plant locations, employee counts) that participants, Defendants, could easily identify their specific competitors. A former Perdue employee confirmed this, stating it was easy when "you're sitting in a meeting and the person across from you [from a competing processor] is reporting on what they do."

3. **Agri Stats, Inc.** provided the mechanism for continuous monitoring and enforcement of the conspiracy.

   a. Agri Stats collected and distributed monthly reports containing terabytes of detailed, current, non-public, and plant-specific compensation data from over 95% of U.S. poultry processors.

   b. Agri Stats collected non-public, confidential, and proprietary wage and compensation data from competing poultry processors and redistributed that data among the processors on a monthly basis, including current hourly wages and salaries broken down by plant and job position. This data was not publicly available and could only be accessed by processors that

26

reciprocated by submitting their own detailed compensation information, thereby enabling coordinated wage decision-making among competitors.

c. Agri Stats falsely represented that its compensation reports were anonymized or aggregated, while knowingly distributing highly granular, disaggregated data that processors could and did reverse-engineer to identify which competitors and which specific plants corresponded to particular wage figures. This sham anonymization concealed the true nature of the inter-company wage exchange while allowing processors to coordinate compensation with precision.

d. Despite claims of anonymity, the data was easily decodable. A former Perdue employee stated the anonymity claim was "just bullshit" and that every participating processor "knew precisely which company reported which data."

e. The monthly frequency of the reports allowed defendants to ensure no co-conspirator broke ranks by raising wages. A former Butterball executive confirmed there was "no question about it" that Agri Stats was used by processors to "monitor each other's performance." The crucial role of this data is underscored by the public statement of Joe Sanderson, then-CEO of Sanderson Farms, that "we live and die by Agri Stats."

f. Agri Stats travelled between each Defendant Processor regularly and discussed the nonpublic, proprietary data at those meetings, including but not limited to quarterly in-person meetings with each processor's executives, involving travel between producers and discussion of non-public data.

g. Agri Stats representatives physically visited each co-conspirator defendant processor plant, conducting on-site meetings lasting at least one week to establish data-collection processes, identify internal payroll data sources, and standardize reporting formats. These visits embedded Agri Stats directly inside processor operations and facilitated the ongoing exchange of sensitive wage information.

27

h. Agri Stats employees and representatives assisted poultry processors in interpreting and decoding Agri Stats reports, including by explaining how to determine which competitor submitted specific compensation data. Agri Stats personnel trained processor management on how to extract competitive intelligence from the reports, further enabling coordinated wage suppression.

i. Agri Stats audited the raw wage data submitted by processors to ensure accuracy and consistency, which ensured that no processor could deviate from agreed-upon compensation levels by secretly paying higher wages. These audits functioned as a policing and enforcement mechanism, reinforcing adherence to coordinated wage suppression.

j. Through the monthly dissemination of current wage data, Agri Stats enabled co-conspirator defendant processors to continuously monitor each other's compensation levels and detect deviations in near real time. This continuous monitoring reduced competitive uncertainty and stabilized wages across processors.

k. Agri Stats data was reviewed at individual poultry processing plants, not merely at corporate headquarters. Corporate officers and plant managers used Agri Stats benchmarks to compare plant wages against competitors and ensure that wages remained within coordinated ranges. Agri State corporate personnel were tasked with visiting plants to ensure wages stayed precisely aligned with Agri Stats benchmarks.

l. Agri Stats' reports were not sold to the public, employees, or unions. Agri Stats concealed the existence and mechanics of coordinated wage suppression from workers.

m. Because Agri Stats regularly travelled between processors, discussed proprietary wage data with each, and audited their submissions, it acted as a central hub connecting competing employers and transmitting information that allowed the conspiracy to function, persist, and remain concealed.

n. Each of the foregoing acts was intentional, knowing, and undertaken in furtherance of a common scheme to suppress and stabilize wages. Agri

28

Stats knew that the compensation data it collected, analyzed, audited, and redistributed would be used by competing poultry processors to coordinate wage decisions, and Agri Stats substantially assisted that scheme through repeated, affirmative conduct resulting in harm to plaintiffs.

### 3. Direct Plant-to-Plant Communications

1. The conspiracy was furthered by frequent, direct communications between managers at competing plants. Plant managers and human resources personnel regularly contacted their counterparts at nearby rival facilities to request and exchange current and future wage and benefit information.

2. A former human resources manager who worked for both Perdue and George's admitted to this practice, stating, "We would collaborate. We would talk among each other to see what they were doing for pay."

### D. Fraudulent Concealment of the Conspiracy

1. The defendants took active and deliberate steps to fraudulently conceal their unlawful conduct from their employees and the public. These steps included:

   a. Holding secret, "off the books" meetings and requiring in-person attendance to avoid a paper trail.

   b. Using third-party consultants and sham data anonymization techniques to create a facade of legality for their illicit information exchanges.

   c. Making false and misleading public statements on company websites and in advertisements claiming they paid "competitive wages," all while actively conspiring to suppress those same wages.

2. Following increased scrutiny, including the filing of a separate price-fixing lawsuit in 2016, several defendant Processors abruptly withdrew from the WMS survey, citing the "advice of legal counsel." This change in behavior is compelling evidence of the defendants' consciousness of guilt.

### E. Harm to the Plaintiffs

1. The direct and intended result of the defendants' conspiracy was the artificial suppression of worker compensation. While worker productivity skyrocketed

with processing line speeds increasing by **54%** between 1999 and 2015 the real-world earnings of those workers plummeted. During that same period, inflation-adjusted hourly wages for poultry processing workers *decreased* by more than **1%**.

2. The small annual raises that workers did receive were often entirely offset by corresponding increases in health insurance premiums. As a direct result of the conspiracy, the plaintiffs and other similarly situated workers were paid materially less than they would have been in a competitive market, which systematically transferred wealth from the plaintiffs and the class to the defendants in the form of artificially inflated corporate profits.

### F. Specific Allegations Against Each Defendant

1. **The Perdue Defendants:** Perdue was a central and long-standing participant in the conspiracy. Its employees attended every annual compensation meeting between 2001 and 2019, submitted detailed compensation data to WMS every year from 2000 to 2019, and subscribed to Agri Stats. A former Perdue employee described the company's CEO as an "Agri Stats guru" and stated that Perdue managers regularly collaborated with rivals to exchange wage information.

2. Perdue employees knew that compensation data submitted through WMS was readily attributable to specific companies and plants, particularly during in-person meetings where competitors discussed their own reported data. A former Perdue employee explained that the source of compensation figures was obvious because "you're sitting in a meeting and the person across from you is reporting on what they do."

3. Upon information and belief, Perdue used the Agri-Stats data to incorporate and monitor the conspiracy to suppress wages and ensure compliance by all defendants with the conspiracy.

4. Perdue subscribed to Agri Stats to exchange current, disaggregated, readily decodable, and plant-specific compensation data with competing poultry processors including co-conspirator defendants on a monthly basis.

5. Perdue regularly attended the annual meetings of co-conspirator defendants and obtained and exchanged competing processors information regarding wages, agreed to the conspiracy to suppress wages at artificially depressed levels.

30

6. Perdue submitted data to the annual WMS survey during multiple years and subscribed to Agri Stats to exchange plant-specific compensation data on a monthly basis.

7. Perdue regularly exchanged current and future wages with managers from co-conspirator defendants and any planned future wage increases.

8. Perdue brought Agri Stats personnel into the company to train management on how to extract and interpret competitor-specific wage information from Agri Stats reports, despite the nominal claim that the data was anonymous.

9. Perdue employees reviewed disaggregated Agri Stats wage data during meetings held at Perdue poultry processing plants, using competitor comparisons to guide wage decisions at individual facilities rather than responding to local labor market forces.

10. Perdue and other co-conspirator defendants continued to reveal and discuss their specific compensation practices, future compensation plans, and target wage levels "behind closed doors", even after being warned that such conduct was inconsistent with lawful compensation benchmarking.

11. Perdue's knowing participation in repeated data exchanges, secret meetings, and direct communications predictably suppressed wages and benefits paid to poultry processing workers, transferring economic value from workers to Perdue in the form of reduced labor costs and increased profits.

12. Each of the foregoing acts was intentional, knowing, and undertaken in concert with other co-conspirator defendants pursuant to a common plan to suppress employee compensation. Perdue knowingly joined and materially advanced a coordinated scheme that foreseeably caused economic harm to poultry workers, including Plaintiffs, and unjustly enriched Perdue at the expense of plaintiffs and those similarly situated.

13. **The Tyson Defendants:** Tyson was a leader of the conspiracy, serving on the Steering Committee that directed the WMS surveys. A Tyson Vice President of Compensation admitted in a 2015 email that "hourly production projected budgets" were "typically a discussion item" at the secret meetings. From 2013 to 2015, Tyson single-handedly paid WMS to conduct an even more granular survey

to facilitate the exchange of raw, plant-level data, despite WMS's warnings that this violated the applicable law.

14. Tyson subscribed to Agri Stats and used it to exchange current, disaggregated, readily decodable, plant-specific compensation data with competing poultry processors on a monthly basis.

15. Tyson relied on Agri Stats reports to compare its wages to competitors and to keep its compensation within coordinated ranges rather than responding independently to labor market conditions.

16. Tyson employees and executives regularly attended secret, off-the-books Poultry Industry Compensation Committee meetings, including meetings held at the Hilton Sandestin Resort in Destin, Florida, where competing poultry processors exchanged non-public compensation information and discussed wages and benefits. These meetings were intentionally conducted outside normal reporting channels and without transparency to employees, and they facilitated coordinated wage decisions rather than independent competition.

17. Tyson was represented on the Steering Committee that controlled the structure, scope, and content of the WMS poultry compensation surveys for most of the relevant period. Through this role, Tyson participated in decisions to expand the surveys beyond generalized averages and to require more granular, plant-level, and job-specific compensation information, increasing the usefulness of the surveys for coordinating wages rather than benchmarking competitively.

18. Tyson initiated, designed, and funded a supplemental compensation survey that collected raw, disaggregated, plant-level wage data for production, maintenance, and refrigeration workers. Tyson requested this survey despite warnings that its format violated accepted safeguards and facilitated identification of individual companies' and plants' wage data. Tyson paid for the survey, dictated its structure, and caused its results to be distributed to participating processors.

19. Tyson employees recruited other poultry processors to participate in the Tyson-sponsored survey and encouraged their submission of detailed wage data. Participants proceeded despite express warnings that the survey format defeated anonymity and allowed compensation data to be traced back to specific companies and plants.

20. Tyson regularly attended the annual meetings of co-conspirator defendants and obtained and exchanged competing processors information regarding wages, agreed to the conspiracy to suppress wages at artificially depressed levels.

21. In advance of and for use at these secret compensation meetings, Tyson employees submitted highly detailed current and future compensation data to WMS, knowing and intending that the data would be distributed to, reviewed by, and discussed among competing poultry processors. Tyson made these submissions repeatedly over multiple years as part of the same coordinated scheme.

22. Tyson submitted data to the annual WMS survey during multiple years and subscribed to Agri Stats to exchange plant-specific compensation data on a monthly basis.

23. Tyson submitted highly detailed current compensation data to WMS in advance of meetings, knowing/expecting it would be distributed to and examined by competitors including co-conspirator defendants.

24. Tyson regularly exchanged current and future wages with managers from co-conspirator defendants and any planned future wage increases.

25. Tyson set compensation schedules and paid workers at "artificially depressed, wage fixed rates

26. Tyson employees directly communicated with human-resources managers at competing poultry plants, including co-conspirator defendants to exchange current and future wage rates, including planned increases. These bilateral exchanges further reduced competition for labor and reinforced coordinated wage suppression.

27. As a result of this conduct, Tyson established compensation schedules and paid poultry workers' wages and benefits that were artificially suppressed and stabilized, rather than competitively determined. Tyson retained the financial benefit of reduced labor costs while workers bore the harm of depressed compensation resulting in damages to plaintiffs.

28. **Pilgrim's Pride Corporation:** Pilgrim's Pride was a core member of the conspiracy. A former employee stated that the company explicitly used Agri Stats data to set wages with the goal of paying "exactly in the middle" of the reported industry

average. Its executives also requested that plant managers obtain current and future compensation information directly from competitors.

29. Pilgrim's subscribed to Agri Stats to exchange current, disaggregated, readily decodable, and plant-specific compensation data with competing poultry processors on a monthly basis.

30. Pilgrim's regularly attended the annual meetings of co-conspirator defendants and obtained and exchanged competing processors information regarding wages, agreed to the conspiracy to suppress wages at artificially depressed levels. In 2017, Pilgrim's withdrew from the annual meeting on the advice of counsel, demonstrating consciousness of its illegal conduct. However, they resumed participation in these meetings in 2018 and 2019.

31. Pilgrim's employees submitted detailed compensation data to WIMS for inclusion in the annual Poultry Industry Compensation Surveys. Pilgrim's knew and intended that this data, including current wages and planned future increases, would be distributed to and reviewed by competing processors during compensation meetings and related discussions.

32. Pilgrim's was among the co-conspirator defendants that controlled and influenced the design and operation of the WMS surveys, including decisions to collect granular, plant-level and job-specific compensation data. Pilgrim's participated in surveys structured in a manner that allowed competitors, including co-conspirator defendants, to identify and compare each other's compensation practices.

33. Pilgrim's regularly exchanged current and future wages with managers from co-conspirator defendants and any planned future wage increases.

34. Pilgrim's used Agri Stats data at both corporate and plant levels, reviewing competitor compensation benchmarks to ensure that wages paid at individual Pilgrim's facilities remained aligned with industry benchmarks. Corporate personnel reviewed Agri Stats data with plant management to guide wage decisions.

35. In addition to survey-based exchanges, Pilgrim's Pride employees directly exchanged current and future wage information with employees of competing poultry processors. For example, Pilgrim's personnel exchanged wage information

34

with Tyson employees regarding planned wage rates at specific plants, reducing uncertainty and reinforcing coordinated wage practices.

36. According to WMS President Jonathan Meng, Pilgrim's and other processors continued to discuss specific compensation practices, future wage plans, and target pay levels "behind closed doors", even after warnings that such exchanges were inconsistent with lawful benchmarking practices. Pilgrim's nevertheless continued participating in the surveys and meetings.

37. Pilgrim's established compensation schedules using survey results and Agri Stats benchmarks to align wages across its poultry processing facilities, rather than allowing wages to be determined by local labor supply and demand.

38. Through its participation in repeated data exchanges, secret meetings, and direct communications, Pilgrim's paid poultry processing workers, including the plaintiffs, wages and benefits that were suppressed and stabilized, transferring economic value from workers to Pilgrim's in the form of reduced labor costs.

39. Pilgrim's operated poultry processing facilities employing workers in Alabama and implemented compensation practices at those Alabama facilities that were informed by and aligned with the coordinated benchmarks and exchanges described above. These acts were directed at and caused harm to Alabama workers, including Plaintiffs.

40. Each of the foregoing acts was intentional, knowing, and undertaken in concert with others. Pilgrim's knowingly participated in a coordinated course of conduct that foreseeably suppressed employee compensation and unjustly enriched Pilgrim's at the expense of poultry processing workers, including Plaintiffs.

41. **Sanderson Farms, Inc.:** Sanderson subscribed to Agri Stats to exchange current, disaggregated, readily decodable, and plant-specific compensation data with competing poultry processors on a monthly basis.

42. Sanderson employees submitted detailed compensation data to WMS for use in the annual Poultry Industry Compensation Survey, with the understanding that the data would be shared with and reviewed by competing processors at the compensation meetings including co-conspirator defendant processors. This

35

included current wage information used to benchmark and align compensation across companies.

43. Sanderson Farms participated in surveys that were structured to allow competitors, including co-conspirator defendant processors, to identify the source of compensation data, including through granular plant-level details. Survey participants, including Sanderson Farms, reviewed compensation information in formats that allowed executives to match wage figures to specific competing companies and facilities including co-conspirator defendant processors.

44. Sanderson regularly attended the annual meetings of co-conspirator defendants and obtained and exchanged competing processors information regarding wages, agreed to the conspiracy to suppress wages at artificially depressed levels.

45. Sanderson Farms was deeply integrated into the conspiracy, with its then-CEO publicly stating, "we live and die by Agri Stats." Like other conspirators, Sanderson Farms attended the secret annual meetings before withdrawing from the WMS survey group in 2012, informing other members that it was doing so "On the advice of legal counsel."

46. Following Sanderson Farms' merger with Wayne Farms, the resulting Wayne-Sanderson entity continued poultry processing operations using compensation structures informed by industry benchmarking practices, including Agri Stats data, thereby perpetuating the effects of the coordinated wage-setting scheme.

47. Through the foregoing conduct, Sanderson Farms paid poultry processing workers, including plaintiffs, wages that were suppressed and stabilized, transferring economic value from workers to Sanderson in the form of reduced labor costs and increased profitability.

48. Each of the foregoing acts was intentional, coordinated, and undertaken in concert with others. Sanderson Farms knowingly participated in a shared course of conduct that predictably suppressed employee compensation and unjustly benefited Sanderson at the expense of poultry processing workers, including Plaintiffs.

49. **Agri Stats, Inc.:** Agri Stats was the central monitoring and enforcement arm of the conspiracy as previously stated herein. It collected and distributed detailed, non-

public, and readily decodable compensation data on a monthly basis. A former Perdue employee stated Agri Stats was responsible for "collusion in the poultry industry," and by admission of a former producer, confirmed that Agri Stats was used to monitor each other's performance. Agri Stats profited handsomely from its role, charging each processor substantial fees.

50. **Cargill Meat Solutions:** Cargill employees attended regular annual meetings, and every annual meeting between 2001 and 2019 where executives from competing poultry processors gathered to exchange information about, discuss, agree upon, and fix the wages, salaries, and benefits of the plaintiffs and those similarly situated at artificially depressed levels.

51. Cargill submitted data to the annual WMS survey during multiple years and subscribed to Agri Stats to exchange plant-specific compensation data on a monthly basis.

52. Cargill exchanged current and future wages with managers of co-conspirator defendants and any planned future wage increases.

53. Cargill and other processors, including co-conspirator defendants, continued to reveal and discuss specific compensation practices, future wage plans, and target pay levels behind closed doors, even after being warned that such exchanges posed legal risks and were inconsistent with lawful benchmarking safeguards.

54. Through the foregoing conduct, Sanderson Farms paid poultry processing workers, including plaintiffs, wages that were suppressed and stabilized, transferring economic value from workers to Sanderson in the form of reduced labor costs and increased profitability.

55. Cargill operated poultry processing facilities and related operations employing workers in Alabama and implemented compensation practices at those Alabama facilities that were informed by and aligned with the coordinated benchmarks and exchanges described above. These acts were directed at and caused harm to Alabama workers, including Plaintiffs.

56. Each of the foregoing acts was intentional, knowing, and undertaken in concert with others. Cargill knowingly joined and materially advanced a coordinated

scheme that foreseeably suppressed employee compensation and unjustly enriched Cargill at the expense of poultry processing workers, including Plaintiffs.

57. **Fictitious Defendants A-BB:** The individual John and Jane Doe defendants, including but not limited to HR and Plant Managers, successors, were the agents who carried out the conspiracy on the ground. Acting within the scope of their employment and at the direction of their corporate superiors, they engaged in regular bilateral exchanges of current and future wage information with managers at rival plants. These acts directly furthered the conspiracy and benefited their employers by ensuring local pay rates remained aligned and suppressed.

58. The foregoing factual allegations give rise to the following legal claims for relief.

## CAUSES OF ACTION
### COUNT I: FRAUD & FRAUDULENT CONCEALMENT (Against All defendants)

1. Plaintiffs reallege and incorporate by reference all preceding paragraphs as if fully set forth herein.

2. Under Alabama law, a claim for fraudulent concealment is established by showing (1) a duty on the part of the defendant to disclose a material fact; (2) concealment or nondisclosure of that fact; (3) inducement of the plaintiff to act; and (4) action by the plaintiff to his or her injury. *Chiepalich v. Chiepalich,* 392 So. 3d 467 (Ala. 2023); APJI 16.05.

3. Defendants had a duty to disclose to their employees, the plaintiffs, the existence of a conspiracy to artificially fix and suppress their wages. This duty arose from the particular circumstances of the employment relationship and the defendants' superior knowledge of the scheme.

4. Defendants actively and intentionally concealed this material fact by holding off the book meetings, using sham data anonymization to create a facade of legality, and making false public statements about offering competitive wages.

5. Defendants suppressed the existence of their inter-company wage-coordination scheme, a material fact plaintiffs could not reasonably discover, and that would have changed their employment and bargaining decisions

6. This fraudulent concealment induced the plaintiffs to continue their employment with the defendant Processors under the false belief that their compensation was determined by legitimate market forces.

7. As a direct and proximate result of this concealment, Plaintiffs continued to provide their labor for artificially depressed compensation, thereby suffering actual economic damage in the form of lost wages and benefits.

### COUNT II: UNJUST ENRICHMENT (Against Defendant Employer Processors)

1. Plaintiffs reallege and incorporate by reference all preceding paragraphs as if fully set forth herein.

2. The plaintiffs provided something of value to the defendants, their labor;

3. The defendants requested Plaintiffs' labor efforts;

4. The plaintiffs are entitled by law to fair compensation; and

5. Fair compensation is necessary to prevent the defendants from being unjustly enriched. APJI 11.18; *Matador Holdings, Inc. v. HoPo Realty Investments, L.L.C.*, 77 So. 3d 139 (Ala. 2011).

6. The plaintiffs provided a benefit to the defendant Processors in the form of their labor. The defendant Processors knowingly accepted and retained this benefit.

7. Processors retained the benefit of unlawfully reduced labor costs in this jurisdiction.

8. The retention of this benefit is unjust because it was obtained through "unconscionable conduct," namely the fraudulent, coercive, and long-running conspiracy to illegally suppress employee wages. *Jordan v. Mitchell*, 705 So. 2d 453 (Ala. Civ. App. 1997). The defendant Processors have been unjustly enriched by the value of the labor for which they systematically and illegally underpaid the plaintiffs.

### COUNT III: NEGLIGENCE (Against All Defendants)

1. Plaintiffs reallege and incorporate by reference all preceding paragraphs as if fully set forth herein.

2. Defendants owed a duty of reasonable care to their employees and to the labor market to not engage in conduct that would unlawfully restrain trade and artificially suppress wages and cause damages to the plaintiffs and those similarly situated in this jurisdiction.

3. Defendants breached this duty by forming, implementing, monitoring, and concealing a conspiracy that systematically dismantled the competitive mechanisms for wage-setting in the poultry processing industry and caused damages to the plaintiffs and those similarly situated in this jurisdiction.

4. This breach was the direct and proximate cause of the plaintiffs' harm, as it resulted in their compensation being set at artificially depressed levels, causing significant economic damages.

### COUNT IV: WANTONNESS (Against All Defendants)

1. Plaintiffs reallege and incorporate by reference all preceding paragraphs as if fully set forth herein.

2. Wantonness is conduct carried on with a reckless or conscious disregard of the rights or safety of others, with an awareness that harm will likely result. *APJI 9.00; Ala. Code § 6-11-20(b)(3).*

3. The defendants' participated in a multi-decade, systematic, and fraudulently concealed conspiracy to suppress the wages of a vulnerable workforce for the purpose of maximizing corporate profit with a conscious and reckless disregard for the rights of the plaintiffs.

4. Defendants knew or should have known that their actions in eliminating labor market competition would probably and likely result in substantial economic harm to their employees and cause damages to the plaintiffs and those similarly situated in this jurisdiction. Their decision to proceed with this scheme for over twenty years constitutes wantonness and directly and proximately caused damages to plaintiffs.

### COUNT V: CIVIL CONSPIRACY (Against All Defendants)

1. Plaintiffs reallege and incorporate by reference all preceding paragraphs as if fully set forth herein.

2. A civil conspiracy is a combination of two or more persons to do something unlawful or to do something lawful by unlawful means. The underlying torts for this conspiracy include, but are not limited to, fraud, fraudulent concealment, and wantonness, which are sufficient to support a conspiracy claim under Alabama law.

3. As detailed in the Factual Allegations, all defendants agreed and worked together to achieve a common, unlawful end: the suppression of employee compensation, to the detriment of the plaintiffs causing damages to the plaintiffs and those similarly situated in this jurisdiction.

4. Defendants achieved this end through unlawful means, including secret meetings, fraudulent information exchanges, and other tortious acts as outlined herein. This concerted action directly and proximately caused the plaintiffs' economic and emotional harm.

### COUNT VI: OUTRAGE (INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS) (Against All Defendants)

1. Plaintiffs reallege and incorporate by reference all preceding paragraphs as if fully set forth herein.

2. Defendants' conduct, a multi-decade, secret scheme to exploit a captive and vulnerable workforce for corporate profit by illegally suppressing their wage, is so outrageous in character and so extreme in degree that it goes beyond all bounds of decency, and it is regarded as atrocious and utterly intolerable in a civilized society.

3. This intentional and extreme conduct caused the plaintiffs severe emotional distress, including feelings of anxiety, hopelessness, and betrayal, resulting from the knowledge that their hard labor was systematically undervalued through an illegal and fraudulent scheme.

4. The defendants intended to cause, or knew their conduct was likely to cause, emotional distress of Plaintiffs and those similarly situated in this jurisdiction;

5. The defendants' conduct was extreme and outrageous;

6. The defendants' conduct caused emotional distress; and

41

7. The distress to Plaintiffs was severe.

### COUNT VII: INTENTIONAL INTERFERENCE WITH A BUSINESS RELATIONSHIP (Non-employer co-conspirators)

1. Plaintiffs reallege and incorporate by reference all preceding paragraphs as if fully set forth herein.

2. Each Plaintiff had a protectible business relationship with their respective employer (one of the defendant Processors).

3. Employment relationships existed between each Plaintiff and their direct employer.

4. The co-conspirator defendants intentionally interfered with these relationships by engaging in a conspiracy to fix wages at artificially low levels, thereby altering a fundamental term of the employment relationship to the plaintiffs' detriment.

5. The co-conspirator defendants knew or should have known that their actions would cause damages to workers in this jurisdiction, including the plaintiffs and those similarly situated.

6. This intentional interference directly and proximately damaged the plaintiffs by causing them to receive suppressed compensation.

### COUNT VIII: VICARIOUS LIABILITY & RATIFICATION (Against Defendant Processors)

1. Plaintiffs reallege and incorporate by reference all preceding paragraphs as if fully set forth herein.

2. Pursuant to APJI 5.00, 5.08, 9.03, and Ala. Code § 6-11-27, the Defendant Processors are vicariously liable for the wrongful acts of their agents and employees, including the individual HR and Plant Manager Defendants.

3. These employees acted within the line and scope of their employment when they participated in the conspiracy, as their acts of exchanging wage data were part of their job responsibilities and were calculated to benefit their employers by lowering labor costs.

4. The defendant Processors, with full knowledge of the facts and circumstances of this conduct, ratified the wrongful acts of their employees by accepting the benefits of suppressed labor costs and continuing the conspiracy for over two decades which directly and proximately caused damages to the plaintiffs.

### PRAYER FOR RELIEF

**WHEREFORE, PREMISES CONSIDERED,** Plaintiffs respectfully request that this Honorable Court enter a judgment in their favor and against the defendants, jointly and severally, and award the following relief:

1. A judgment in favor of the plaintiffs and against the defendants, not to exceed $74,999.00 per Plaintiff;

2. An award of compensatory damages in an amount to be determined at trial for lost wages, salaries, and benefits;

3. An award of damages for mental anguish and emotional distress in an amount to be determined at trial;

4. An award of punitive damages in an amount sufficient to punish the defendants for their fraudulent, wanton, and malicious conduct and to deter similar conduct in the future;

5. An award of pre-judgment and post-judgment interest as allowed by law;

6. An award for the costs of this action and reasonable attorneys' fees; and

7. Such other and further relief as the Court deems just, equitable, and proper.

*/s/ Christina D. Crow*
One of the attorneys for Plaintiffs

OF COUNSEL:
Christina D. Crow (CRO064)
C. Elizabeth Littell (LIT028)
Kijana Mitchell (MIT080)
JINKS CROW, PC
219 N. Prairie Street
Union Springs, AL 36089
334-738-4225

43

christy.crow@jinkscrow.com
lisa.littell@jinkscrow.com
kijana.mitchell@jinkscrow.com

## JURY DEMAND

Plaintiffs demand a trial by jury on all issues so triable.

/s/ Christina D. Crow
OF COUNSEL

**Service on Defendants as follows:**

Agri Stats, Inc.
c/o Brenda Sievers
6510 Mutual Dr
Fort Wayne, IN 46825

Perdue Farms, Inc.
c/o CT Corporation System
2 N Jackson Street, Suite 605
Montgomery, AL 36104

Perdue Foods LLC
c/o CT Corporation System
2 N Jackson Street, Suite 605
Montgomery, AL 36104

Tyson Foods, Inc.
c/o United Agent Group Inc.
1521 Concord Pike, Suite 201
Wilmington, DE 19803

Pilgrim's Pride Corporation
c/o CT Corporation System
2 North Jackson St, Suite 605
Montgomery, AL 36104

44

Wayne-Sanderson Farms LLC
c/o CT Corporation System
2 N Jackson Street, Suite 605
Montgomery, AL 36104

Wayne Farms, LLC
c/o CT Corporation System
2 N Jackson Street, Suite 605
Montgomery, AL 36104

Cargill Meat Solutions, Inc.
c/o United Agent Group Inc.
4000 Eagle Point Corporate Dr
Birmingham, AL 35242

Continental Grain Company
c/o CT Corporation System
2 N Jackson Street, Suite 605
Montgomery, AL 36104

Peco Foods Inc.
c/o Patrick Noland
1101 Greensboro Ave
Tuscaloosa, AL 35401

Foster Poultry Farms, LLC
c/o CT Corporation System
2 North Jackson St., Suite 605
Montgomery, AL 36104